*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-CF-128 & 15-CF-276

TONY ARMSTRONG & FLOYD JOINER, APPELLANTS,

V.

UNITED STATES, APPELLEE.

07/20/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(CF3-2355-13 & CF3-2354-13)

(Hon. William M. Jackson, Trial Judge)

(Argued November 17, 2016                    Decided July 20, 2017)

*Lee T. Friedman*, with whom *Matthew M. Madden*, was on the brief, for appellant Tony Armstrong.

*Gabriel Diaz*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant Floyd Joiner.

*Priya Naik*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Dannelo*, *Clayton O'Connor*, and *Matthew E. Kahn*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] and WASHINGTON[**] and

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge at the time of argument. Her status changed to Chief Judge on March 18, 2017.

[**] Judge Washington was Chief Judge at the time of argument. His status

(. . . continued)

BELSON, *Senior Judges*.

Opinion for the court by *Senior Judge* WASHINGTON.

Dissenting opinion by *Senior Judge* BELSON at page 28.

WASHINGTON, *Senior Judge*: On February 12, 2013, Michael Prince and Ezell Whitaker were robbed fifteen minutes apart and in different locations by two armed black males, who fled in a white vehicle. Officers spotted appellants Tony Armstrong ("Armstrong"), Floyd Joiner[1] ("Joiner"), and their co-defendant Patrick Buckmon ("Buckmon") three to five minutes after the second robbery and eight blocks away in a white vehicle. Officers stopped, seized, and searched appellants and their vehicle. Inside the vehicle, officers found an imitation firearm and Ezell Whitaker's ("Whitaker") personal effects. Appellants were then arrested and indicted for one count of conspiracy to commit robbery while armed,[2] two counts of robbery while armed,[3] and two counts of possession of a firearm during the commission of a crime of violence or dangerous offense.[4] Appellants were

---

(. . . continued)
changed to Senior Judge on March 20, 2017.

[1] Appellant Joiner notes that the correct spelling of his last name is Joyner.

[2] D.C. Code § 22-1805a (2016).

[3] D.C. Code §§ 22-2801, -4502 (2016).

[4] D.C. Code § 22-4504 (b) (2016).

subsequently convicted by a jury for the armed robbery of Whitaker, the associated robbery while armed and possession of a firearm during the commission of a crime of violence or dangerous offense, and for conspiracy. They were acquitted of the Prince robbery.

Prior to trial, appellants moved to suppress the fruits of the officers' search on the grounds that the officers lacked particularized, articulable suspicion to believe appellants were engaged in criminal activity based on generalized lookout descriptions. The trial court denied appellants' motion due to the close spatial and temporal connection between the robberies and stop of appellants' vehicle. On appeal, appellants argue that the denial of their motion violated their Fourth Amendment rights. Appellants raise additional arguments, which need not be addressed in this appeal because, for the reasons set forth below, we reverse appellant Armstrong's conviction and reverse and remand appellant Joiner's conviction.

## FACTUAL SUMMARY

**The Prince Robbery**

At approximately 12:05 p.m. on Tuesday, February 12, 2013, Michael Prince ("Prince"), who was selling illegal cigarettes in a park at 1500 Maryland Avenue, N.E., was approached by two men offering to purchase his wares.

Prince testified that the "bigger" of the two men grabbed him and hit him over the head with a gun. The "smaller" man then grabbed Prince's black briefcase-like bag containing Newport cigarettes off a nearby table. Prince then watched as the bigger man got into the driver seat and the smaller man got into the passenger seat of a white four-door car. Prince did not see anyone else in the vehicle.

Prince flagged down Lieutenant Duncan Bedlion and gave a description of the two men. He described the bigger man as tall and stocky, dark complexion black male, in his forties, wearing a blue sweater and blue jeans, and the smaller man as a medium complexion black male, also in his forties, wearing a light green jacket and blue jeans. Prince initially described the make and model of the suspects' vehicle as a Mercury Sable, and then later on as a Pontiac, and finally as a white four-door sedan. He indicated that the suspects fled eastbound towards the Sixth District police station.

Lieutenant Bedlion issued the following lookout at 12:10 p.m., approximately one minute after receiving the information from Prince:

> All units listen to a simulcast out of 5D [Fifth District] in reference to a robbery hold up gun that just occurred. Morse and Maryland Avenue, Northeast. I have a lookout for two black males. First stocky build wearing a blue sweater; second subject black male wearing a green jacket. Last seen leaving east bound on Maryland Avenue driving possibly in a white Mercury Sable at this time. Possibly a white Mercury Sable. What was taken was U.S. currency, and also a black handgun was used in the robbery. Again, last seen heading in the direction of 6D [Sixth District].

Roughly ten minutes after Lieutenant Bedlion's lookout was broadcasted, Detective Christopher Bastian arrived on the scene and spoke with Prince. Detective Bastian learned from Prince that the suspects' vehicle was an older model four-door white sedan, possibly a Mercury Sable, but that it could also be a Chevrolet.[5] Prince also told the detective that the car had some body damage, possibly a dent in the side, and was missing a piece of molding on the side.

**The Whitaker Robbery**

---

[5] Detective Bastian was impeached on the fact that his notes from the conversation with Prince do not include any reference to a Chevrolet.

At approximately 12:12 p.m. or less than ten minutes after the Prince robbery, Whitaker was robbed by two men at the intersection of 8th and H Streets, N.E. Whitaker testified that he was standing on the corner of 8th and H Streets, selling illegal cigarettes, when he felt a person reaching for him. He turned around, swung at the person, and fell to the ground. While on the ground, Whitaker saw two men. When one of the men grabbed his gray-and-green backpack, Whitaker stood up and launched himself towards them. That is when one of the men brandished a pistol. Whitaker, at the same time, saw Officer Frank Brown, who had witnessed the altercation, coming from across the street. Whitaker yelled to Officer Brown, "Brown, he has a gun."

Officer Brown testified he witnessed only one male struggling with Whitaker and did not observe a second male, a gun, or Whitaker's backpack. Officer Brown did observe one light-skinned male, wearing a tan jacket, blue jeans, a red hat, and Timberland boots, run into an alley where he got into the rear of a white car with dark tinted windows.[6] While Officer Brown testified that the

---

[6] There is a factual issue as to whether Officer Brown identified the vehicle as having tinted windows at the time of the robbery. The government never argued at the suppression hearing that appellants' vehicle had tinted windows; however, the government now raises this fact to support its argument on appeal. Additionally, the trial court did not rely on the tinted windows description in denying appellants' motion to suppress.

vehicle was traveling south on 7th Street, this differed from the northbound direction indicated in his report, filed at the time of the arrest, and the direction he gave as part of his lookout. Officer Brown saw no weapon but testified the fleeing suspect was running with his arm close to his waist like he was holding something.

Officer Brown issued the following lookout, "I got a black male with a gun; he's running through the alley. Black male, blue jeans. He's getting in a car, white car in the south alley. See if you can get someone to 7th and H." Officer Brown broadcasted additional information concerning the suspect's appearance, describing the suspect as black male, wearing blue jeans, a tan coat, and a red hat. Officer Brown also broadcasted that the white vehicle was last seen traveling "Northbound on 7th."

**Seizure and Search of Appellant's Vehicle**

Officers made four stops based on the lookout information broadcasted. Two of those stops involved black male pedestrians. A third involved a white Toyota, in which the officer spotted a red cap. The final stop involved appellants at roughly 12:18 p.m., three to five minutes after Officer Brown's lookout.

Officer Jonathan Klipa originally spotted appellant's white vehicle, a 1998 Chevrolet Lumina, which co-defendant Buckmon owned, at the intersection of 4th and D Street, eight blocks from the Whitaker robbery and fifteen blocks from the Prince robbery. Officer Klipa followed the vehicle for five minutes until it reached the intersection of 11th Street and Independence Avenue, S.E., roughly ten blocks away, where it was stopped. The court below found that the vehicle did not "flee or make any sort of conduct that would give rise to a traffic stop."[7]

Appellant Joiner rode in the rear passenger seat and wore a black fleece top, a black knit cap, and blue jeans. Joiner's black coat covered a backpack in the

---

[7] The government disputes this finding on appeal. Namely, the government claims the trial court did not have the "benefit of Officer Klipa's later trial testimony, which this court may consider." Officer Klipa testified at trial he believed appellants' vehicle was attempting to flee because it attempted a left turn on a green light at the same time a second MPD cruiser was traveling in the opposite direction, roughly a block away, with its lights and siren on. According to Officer Klipa, people normally pull to the right when an emergency vehicle is coming, not to the left. The trial court, however, heard Klipa's belief through Detective Bastian's testimony at the suppression hearing. The court gave no weight to this testimony in its suppression ruling. Officer Klipa's testimony on this point was also thoroughly cross-examined at trial. This court overturns factual findings if they are clearly erroneous. *See* (*Alex*) *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013). "*Undisputed* trial testimony" may be considered in determining whether error was committed in ruling on a pretrial motion to suppress. *West v. United States*, 604 A.2d 422, 427 (D.C. 1992) (emphasis added). Because the trial court's finding that appellants' vehicle did not "flee or make any sort of conduct that would give rise to a traffic stop" was made in consideration of the facts the government now raises and those facts were disputed at trial, the factual finding is not clearly erroneous and will not be disturbed on appeal.

backseat next to him. Appellant Armstrong rode in the front passenger seat and wore a polo shirt and blue jeans. Co-defendant Buckmon drove and had on a grey-hooded sweatshirt. No tan jacket, red cap, blue sweater, or green coat was found on appellants or in the vehicle. Officers removed the men from the vehicle, placed them in handcuffs, moved them to the other side of the street 25 to 30 feet away from the vehicle, and positioned three officers to secure them.

After appellants were removed from the vehicle but prior to any of the appellants being identified as having been involved in either robbery, Officer Riley arrived and searched the vehicle. She recovered one grey-and-green backpack from the backseat, which contained various packs of cigarettes and personal effects of Whitaker. Officer Riley also recovered a second black backpack from the backseat, which was partially covered by appellant Joiner's jacket. Inside was found a black BB gun in plastic packaging.

Subsequently, the police conducted show-up identifications. Detective Bastian took Michael Prince to the stop around 12:49 p.m. Prince identified appellant Armstrong as the bigger man with the gun and appellant Joiner as the little man, who took his bag. Officer Brown along with Whitaker arrived later. Officer Brown identified appellant Joiner as the man he chased into the alley.

Officer Brown testified at trial that he identified appellant Joiner at the scene and thereafter made an in-court identification of appellant Joiner. Whitaker did not identify any of the men at the show-up and refused to acknowledge the backpack in the vehicle as his despite the fact that his personal effects were found in the bag.

**Appellants' Trial**

On May 14, 2013, appellants along with co-defendant Buckmon were indicted for one count of conspiracy to commit robbery while armed, two counts of robbery while armed, and two counts of possession of a firearm during the commission of a crime of violence or dangerous offense for the Prince and Whitaker robberies.

A hearing was held on October 1, 2013, to resolve appellants' motion to suppress evidence seized from the *Terry* stop and warrantless search of co-defendant Buckmon's vehicle, namely the backpacks, the BB gun, and the subsequent show-up identifications. The trial court denied appellants' motion, holding that the stop was reasonable under the circumstances because the seizure occurred "not that far and not that spatially [removed] in terms of time and distance from both robberies."

On November 4, 2014, appellants were convicted of the armed robbery of Whitaker, the associated robbery while armed and possession of a firearm during the commission of a crime of violence count, and the conspiracy count. They were acquitted on the remaining counts for the armed robbery of Prince. Following trial, the court granted Buckmon's motion for judgment of acquittal, finding insufficient evidence to support his convictions. On February 27, 2015, appellants were each sentenced to a term of sixty months incarceration.

## ANALYSIS

This court reviews motions to suppress *de novo* and the hearing court's factual findings for clear error. *See* (*Alex*) *Robinson*, 76 A.3d at 335. We view the "evidence in the light most favorable to the prevailing party," *Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011), and draw all reasonable inferences "in favor of sustaining the trial court's ruling," *Milline v. United States*, 856 A.2d 616, 618 (D.C. 2004). When the trial court wrongfully denies a motion to suppress, reversal is necessary unless the error was harmless beyond a reasonable doubt. *Shelton v. United States*, 929 A.2d 420, 427 (D.C. 2007).

On appeal, appellants argue the trial court erred in denying their motion to suppress. Namely, the information available to the seizing officers lacked sufficient specificity to provide the particularized reasonable suspicion necessary to suspect that appellants were engaged in criminal activity and, therefore, was tantamount to nothing more than a dragnet seizure. Appellants further argue that their vehicle was far removed in space and time from the reported robberies so the trial court's conclusion that the police had reasonable suspicion to stop the vehicle in which appellants were riding based on its temporal and spatial proximity to the crimes was error.

It is firmly established that the "police may briefly detain a person for an investigatory or *Terry*[8] stop if the officers have a reasonable suspicion based on specific and articulable facts that criminal activity may be occurring." *Morgan v. United States*, 121 A.3d 1235, 1237 (D.C. 2015) (citing *Pinkney v. United States*, 851 A.2d 479, 493 (D.C. 2004)). "Reasonable suspicion is a less demanding standard than probable cause. . . ." *Morgan*, 121 A.3d at 1237 (citing *Illinois v. Wardlow*, 120 S. Ct. 673, 675 (2000)). Reasonable suspicion, however, must be particularized and objective as to the individual stopped. *See In re A.S.*, 614 A.2d 534, 537-38 (D.C. 1992). Courts look to the totality of the circumstances in

---

[8] *Terry v. Ohio*, 88 S. Ct. 1868 (1968).

determining whether there was sufficient reasonable suspicion to warrant a stop, but non-particularized suspicion and inarticulate hunches will not sustain a stop. *See (Alex) Robinson*, 76 A.3d at 336. In the absence of other circumstances that provide sufficient particularity, a generalized description applicable to large numbers of people contradicts the Fourth Amendment's jurisprudence demanding specificity and will not suffice to justify the seizure of any individual. *See In re T.L.L.*, 729 A.2d 334, 340 (D.C. 1999) (citing *Turner v. United States*, 699 A.2d 1125, 1128 (D.C. 1997)); *In re A.S.*, 614 A.2d at 540.

In this case, Lieutenant Bedlion's and Officer Brown's lookouts with subsequent additional facts described the suspects' fleeing vehicle as a white car, possibly a Mercury Sable, with tinted windows and two black males.[9] This description, without more, lacks the particularized specificity necessary to warrant the stopping of any vehicle within the District. For the most part, our cases have

---

[9] We note that there were clothing descriptions provided as part of the lookouts, which differed markedly from the clothes that appellants' were wearing when they were stopped. There was also vehicle body damage described by Prince to Detective Bastian that was never broadcasted in the lookouts. That damage was also absent from the vehicle in which appellants were riding. Appellants urge us to consider these facts as being known by all of the officers involved using the collective knowledge doctrine and argue therefore, that the trial court erred in not considering them as undermining reasonable suspicion in this case. While appellants raise an interesting argument, we need not determine in this case whether the collective knowledge doctrine applies because neither of those facts is necessary to our analysis or conclusion.

made clear the difficulty we have supporting a finding of particularized reasonable suspicion when a lookout description is limited to a person's race and a generic clothing color description, especially when more than one suspect is indicated or there are other persons in the vicinity. *See, e.g.*, *In re S.B.*, 44 A.3d 948, 951 (D.C. 2012) (reversing conviction when lookout was for juvenile black male with white pants, messing about in a public park); *In re T.L.L.*, 729 A.2d at 340. (The court reversed T.L.L.'s conviction when his arrest was based on a lookout for black teenagers wearing dark clothing; one medium complexion, another dark brown complexion. "Without identifying information with respect to height, weight, facial hair or other distinguishing features, this description could have fit many if not most young black men."); *In re A.S.*, 614 A.2d at 540 (reversing conviction when lookout was for five young males all dressed alike); *see also Bennett*, 26 A.3d at 752-53 (rejecting particularized suspicion when lookout described clothing of two suspects with particular detail, but no meaningful similarities existed between appellant and the description besides his skin color); *Hampleton v. United States*, 10 A.3d 137, 144-45 (D.C. 2010) (rejecting lookout for black males in dark clothing, but affirming on totality of circumstances); *but see Carpenter v. United States*, 144 A.3d 1141, 1148-49 (D.C. 2016) (affirming conviction when lookout for two African American males, both with hats on, one with a gray hoody and white shirt and the other with a blue hoody and cane matched the description of the

suspects apprehended one minute later); *United States v. Turner*, 699 A.2d 1125, 1128 (D.C. 1997) (affirming conviction when lookout for a black male wearing a black jacket and blue jeans matched suspect's clothing, coupled with arrival on the scene within a minute); *see also* (*Flossie*) *Robinson v. United States*, 756 A.2d 448, 455-56 (D.C. 2000) (noting minor difference in descriptions of defendant's jump suit—red trim or piping versus gold speckles—was insufficient to dispel particularized suspicion). Appellant Joiner contends that our decision in *In re S.B.* "could be applied to this case verbatim, with [Chevrolet] Lumina as S.B. and substituting white cars for juveniles in white pants."

The government, for its part, suggests that the description of the car as a "possible Mercury Sable" could reasonably be understood to be a description for an "American sedan," which the government then argues justifies the particularized suspicion of appellants' Chevrolet Lumina. While it is understandable that the description of a getaway vehicle may lack specificity or that a witness may err with respect to the make and/or model of the car, it is difficult to see how "American sedan" provides more particularity to justify the stopping of appellants' vehicle than "Mercury Sable." The government cites for support *Groves v. United States*, 504 A.2d 602 (D.C. 1986), a case where individualized reasonable suspicion was sustained when an officer pulled over a

Chevrolet even though the lookout was for a Pontiac. *Id*. at 602-03. However, the government fails to note that in addition to the officer's testimony during the suppression hearing that the two cars were similar in look, there was evidence presented that the stopped vehicle had a distinctly "white-over-green" appearance that matched the lookout description and the officer had received a second lookout moments before the stop that the complainant had at that very moment observed the suspect's vehicle pass by the officer's own cruiser. Both of those factors were critical to this court's determination that reasonable articulable suspicion existed in that case. *Id*. at 603. The Maryland Court of Appeals also addressed a very similar argument in *Cartnail v. State*, 753 A.2d 519, 531 (Md. 2000). There, the officers involved were on the lookout for a gold or tan Mazda but stopped the appellant's gold Nissan. The State argued that the Mazda designation sufficiently narrowed the group of innocent travelers such that the stop of a Nissan vehicle was justified. *Id*. In rejecting the State's argument the Court noted:

> Under this premise, the police, with solely a gold or tan Mazda manufacturer description, would have unfettered discretion to pull over seemingly infinite combinations of drivers. Within this assumptive universe would be any gold or tan (or other similar color—yellow, beige, light brown, "champagne") vehicle, be it early model or late model; two door, four door, or five door; sub-compact, compact, convertible, sedan, station wagon, van, SUV, pick up truck, or sport car; and, whether attributed to any so-called

> "Japanese" manufacturer such as Honda, Subaru, Toyota, Isuzu, Mitsubishi, Nissan, Suzuki, and perhaps affiliated luxury manufacturers such as Lexus, Infiniti, or Acura, as well as vehicles manufactured by Japanese automakers and sold under non-Japanese manufacturer logos such as General Motors, Daimler–Chrysler, or Ford.

*Id.* We agree with the reasoning of the Maryland Court of Appeals and similarly reject the idea that the designation of a "white Mercury Sable" as the getaway car provides police with sufficient particularized suspicion to justify the stop of any white "American sedan." To conclude otherwise would give police officers "unfettered discretion to pull over an infinite number" of white vehicles. *Id.*

The presence of a generalized lookout description applicable to a large number of people is not in-and-of-itself dispositive to the reasonable suspicion analysis. Due to the totality of the circumstances requirement, "an imperfect description, coupled with close spatial and temporal proximity between the reported crime and seizure," can justify a *Terry* stop. *United States v. Turner*, 699 A.2d 1125, 1129 (D.C. 1997); *see also In re T.L.L.*, 729 A.2d at 340-41 (finding that a generalized description "might not have been fatal if the suspects were apprehended immediately after the robbery at the location where the crime occurred"). Besides spatial and temporal proximity, there are a number of other

important factors to consider when looking at the totality of the circumstances: the number of people about in the area, multiple other stops, "the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and the viewing of an object or bulge indicating a weapon." *Umanzor v. United States*, 803 A.2d 983, 993 (D.C. 2002) (citing *Anderson v. United States*, 658 A.2d 1036, 1038 (D.C. 1995)); *see also Hampleton*, 10 A.3d at 145 (suspect alone in area); *In re T.L.L.*, 729 A.2d at 340 (multiple other stops). "[T]hese factors are not elements of a conjunctive test, and no one fact is outcome determinative." *Umanzor*, 803 A.2d at 993 (internal citations omitted). While never creating nor endorsing a balancing test *per se*, when looking at the totality of the circumstances, courts essentially weigh facts that contract the relevant universe of potential suspects against facts that expand it, in order to determine whether there is particularized reasonable suspicion in any one person. *See In re T.L.L.*, 729 A.2d at 341 (citing 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 9.4 (g) at 198 (3d ed. 1996) ("Sometimes, the universe will be small enough that no description at all will be required to justify a stopping for investigation.").

It is problematic to discuss any one of these factors independent of the others as they are always considered in sum, but some important trends have developed

regarding individual factors that are relevant to our analysis here. Beginning with spatial and temporal proximity, which undoubtedly are the two most significant factors justifying the stop in this case, a finding of particularized suspicion is frequently affirmed when these factors are at their nadir, limiting the relevant universe of potential suspects. *See In re T.L.L.*, 729 A.2d at 340-41. With regards to temporal proximity, particularized reasonable suspicion is usually found when the passage of time between the occurrence of a crime and a subsequent stop is immediate or within only a few minutes; a longer passage of time, however, does not negate particularized suspicion as long as other factors are present. *Compare Umanzor*, 803 A.2d at 994 (affirming reasonableness of vehicle stop that occurred twenty-five minutes after a stabbing but only a few seconds following the lookout broadcast; time of day, similarity of vehicle, and proximity to Maryland border factored into determination), *and Turner*, 699 A.2d at 1126-30 (affirming reasonable suspicion when officers responded to a particular location within one minute and found defendant matching lookout for a black male wearing blue jacket and blue jeans), *with In re T.L.L.*, 729 A.2d at 341 n.6 (finding that fifty-five minutes was far too long to support any inference that the robbers who had a vehicle would still be at or near the crime scene), *In re A.S.*, 614 A.2d at 538 (reversing denial of motion to suppress where the passage of a few minutes was enough time for two of the five suspects to walk away from the group), *and*

*Cauthen v. United States*, 592 A.2d 1021, 1023 (D.C. 1991) (recognizing that the passage of fifteen minutes was "considerably longer than the delay involved in [the Court's] past decisions on point"). These cases also highlight how flight affects a court's view of the impact of the passage of time on the reasonableness of any subsequent stop. For instance when a potential suspect is reported to be standing on a corner or walking down a particular street, this permits a slightly longer passage of time as the suspect is unlikely to be far from the location of the crime and his or her location accurately determined. Conversely, fleeing in a vehicle has the ability to encompass the entire District into the relevant universe in a matter of minutes and so a shorter period of time is necessarily important to the determination of whether a stop is reasonable.

Spatial proximity is typically considered along with the time of day and number of people about in a given area. *See In re T.L.L.*, 729 A.2d at 341 (The relevant universe is "determined primarily by the size of the area within which the offender might now be found (as indicated primarily by the amount of time which has passed since the offense) and the number of people about in that area."). Being alone in the area of the reported crime limits the universe of potential persons ensnared by a general description and strengthens individualized suspicion in any one person. *See Hampleton*, 10 A.3d at 145 ("In the midst of this chaotic and

ongoing criminal investigation, [the defendant] appeared, walking alone on a deserted grassy area along North Capitol Street at 10:30 p.m. Not only did he match the description of the robbery suspects as a black male in dark clothing, but [the defendant] was the only person in the area that [the officer] saw at all."). Presence in a populated area, though, does the opposite. *See In re S.B.*, 44 A.3d at 956 (rejecting particularized suspicion in part because the relevant universe included a popular playground that was part of a larger park area and included a field area and a number of basketball and tennis courts).

Likewise, a lack of information in a lookout indicating the direction in which a suspect may have fled, coupled with the fact that many other people are out and about in the area, has led this court to conclude that the police lacked particularized suspicion to stop an individual based on the suspect's location in relation to the scene of a robbery. *See Bennett*, 26 A.3d at 753-54 (explaining that seeing appellant seven or more minutes after the robbery, a block and half away from the scene of the robbery in a fashion that did not suggest that he had just arrived at that location, "did not afford the officers a reasonable basis for a particularized suspicion that appellant was one of the robbers."); *In re K.P.*, 951 A.2d 793, 797-98 (D.C. 2008) (finding a description that indicated a group of juveniles had walked either north or south before turning west gave too much leeway for the

police to stop any group of juveniles walking in that area).

Lastly, time of day helps determine the scope of the relevant universe. Less specificity in a lookout suffices in the early morning hours when fewer persons are about than is required for stopping a person at high noon. *See In re T.L.L.*, 729 A.2d at 347 (King, J. dissenting) (quoting 4 WAYNE R. LAFAVE, SEARCH AND SEIZURES § 9.4 (g) at 198 (3d ed. 1996)) (arguing that the early morning hour in a residential area on a cold April night limits the universe of potential people about); *see also In re K.P.*, 951 A.2d at 798 (factoring in the location where the suspects were reported to be is busy at 10:00 p.m.); *Umanzor*, 803 A.2d at 994 (factoring in the early morning hours when traffic is light).

Here, the trial court determined appellants' stop was reasonable under a totality of the circumstances because the vehicle was "stopped not that far and not that spatially in terms of time and distance from both robberies." The facts cited by the court in its analysis of the spatial and temporal proximity are the time of the second robbery and the time and location where Officer Klipa observed appellants' vehicle, which occurred three to five minutes after the second robbery. The trial court does not expand on the facts any further merely saying that the stop occurred "moments after the second robbery and moments after the first robbery."

Appellants argue that a stop fifteen minutes after the Prince robbery is far too great an amount of time for the stop to be temporally connected to the crime. In those fifteen minutes, a vehicle obeying all traffic laws could likely have traveled up to thirty-six blocks from the scene of the crime.[10] Appellants were in fact spotted seventeen blocks southwest from the Prince robbery. However, the Prince robbery did not happen in isolation. The Whitaker robbery occurred twelve minutes later and a second lookout was broadcasted. Appellants were then observed roughly three to five minutes after the lookout.[11] Case law supports restarting the spatial and temporal analysis following subsequent lookouts, especially when new information shrinks the relevant universe. *See Umanzor*, 803 A.2d at 996 (observing suspects two seconds after lookout, which came twenty-five minutes after reported stabbing, supported affirming reasonable suspicion); *McFerguson v. United States*, 770 A.2d 66, 73 (D.C. 2001) (affirming stop five minutes after subsequent sighting and twenty minutes after the crime itself); *Groves v. United States*, 504 A.2d 602, 604-05 (D.C. 1986) (affirming stop after

---

[10] Officer Klipa followed appellants for three to five minutes, and while obeying all traffic laws, they were able to travel from 4th and D Streets, N.E., to 11th Street and Independence Avenue, S.E., roughly 12 blocks away.

[11] Furthermore, Officer Klipa's testimony at trial indicates that his involvement in the search occurred after and in response to Officer Brown's lookout from the Whitaker robbery.

second lookout reported that suspect's vehicle had just passed a police cruiser). Here, appellants were spotted eight blocks from the Whitaker robbery, which took place on the corner of 8th and H Streets, N.E. However, if the reported direction of the perpetrator's flight is factored into the reasonableness evaluation, a search area of roughly one square mile is created. That search area contains everything between Florida and Massachusetts Avenues and between Union Station and 14th Street. It also contains the busy H and 8th Street corridors.

Appellants highlight extensively the large search area, the time of day, and the population of cars in this area. The government counters that, given the "residential character of the neighborhood" where appellants were stopped, it would be surprising to see a vast number of cars driving around that hour, particularly white sedans. However, the residential character of the neighborhood where appellants were finally stopped is not really relevant to our analysis. The character of the neighborhood where the crime was committed and, more importantly, the location where appellants' vehicle was first sighted are more relevant to our consideration of whether sufficient particularized suspicion existed to justify a stop of appellants' vehicle. Here, appellants' car was first seen in an area that was four blocks south and west of the busy H Street corridor and one block north of Massachusetts Avenue. Although no evidence was presented of the

number of white cars on the road at the time of the robbery, it is the government's burden to show that the stop of appellants' car was reasonable under the totality of the circumstances and the time of the stop and day of the week does not appear to help the government's position. Appellants were sighted on a weekday at 12:18 p.m. It would not seem to be unusual for there to be a number of white cars on the road at that time of day, within a few blocks of the Capitol and Union Station. We have been unable to find a case where reasonable particularized suspicion was found to exist based on a generalized lookout at a time of day when a large number of cars and/or people are likely to be present, let alone at high noon on a Tuesday in a major metropolitan area. *But see In re K.P.*, 951 A.2d at 798 (reversing the stop and search of a group of juveniles based on a lookout, which lacked a description of the individuals being sought, and where the juveniles were stopped at 10:00 p.m. on a busy street).

The government further argues it was reasonable for officers to think that the suspects might have been found within a four block radius of the robbery, three minutes thereafter thus increasing the likelihood that the stop was sufficiently particularized to meet the demands of the Fourth Amendment. While that may be true, the relevant question for determining whether particularized suspicion exists is not whether it was reasonable to think the robbers might be in this area. The

question is does the information provide the officers with sufficient particularized suspicion to believe that appellants' white car was the one being sought as opposed to any other white cars in the area. While it is certainly reasonable for an officer to believe that the suspects could be within a four block radius of the robbery a few minutes after the robbery, it is just as likely that other white cars are also being driven in that same area around noon on a weekday who have absolutely nothing to do with any criminal activity. Without more, this amounts to a prohibited dragnet search which we cannot endorse. *See In re A.S.*, 614 A.2d at 540 ("[I]t is clear that the kind of dragnet seizure of three youths who resembled a generalized description cannot be squared with the long standing requirement for particularized, individual suspicion.").

The government suggests that Officer Klipa's call to the dispatcher where he learned that the fleeing car was still at large "precluded a dragnet seizure" because Officer Klipa "confirm[ed] or dispel[ed] his suspicions" before stopping the appellants. Although this court has credited the value of corroborating suspicions prior to making a stop, the only suspicion corroborated here by Officer Klipa was that the fleeing car was still at large, not that appellant's vehicle was in fact that fleeing car. *See, e.g.*, *In re S.B.*, 44 A.3d at 956-57 (recognizing that officers failed to corroborate tip prior to stop). The government also emphasizes that the lookout

tip came from Officer Brown who witnessed the robbery and not secondarily from a citizen, which might demand further corroboration. That fact, however, does not excuse the generalized nature of Officer Brown's lookout, which itself demanded further corroboration.

We are not blind to the difficulties faced by law enforcement officer in collecting and distributing competent information immediately following reports of criminal activity; however, the Fourth Amendment's requirement for particularized, reasonable, and articulable suspicion is not "toothless" either. (*Alex*) *Robinson*, 76 A.3d at 336. Looking at the totality of the circumstances, the lookouts, which boiled down to two black men in a white car, at high noon on a weekday, in downtown D.C., were simply insufficient to generate any particularized suspicion that the appellants here were the suspects being sought in connection with the Prince and Whitaker robberies.

## CONCLUSION

Because the stop of appellants' vehicle lacked particularized, reasonable suspicion, the seizure and subsequent search were invalid. Thus the trial court erred in denying appellants' motion to suppress evidence of that unlawful search—

including: Whitaker's backpack, the BB gun, and the show-up identifications. Without this evidence, no reasonable juror could find that appellant Armstrong robbed Whitaker, and, thus, we reverse his convictions.

As to appellant Joiner, we cannot say the evidence was insufficient given Officer Brown's in-court identification of him as the individual he saw fighting with Whitaker and Whitaker's testimony concerning the robbery. Therefore, we reverse Joiner's conviction and remand the case for further proceedings consistent with this opinion. *See Ellis v. United States*, 941 A.2d 1042, 1048-51 (D.C. 2008) (remanding factually similar matter for further proceedings).

*So ordered.*

BELSON, *Senior Judge*, dissenting: I respectfully dissent from the holding that the police did not have a reasonable, particularized, articulable suspicion that the car they stopped was transporting persons who had committed a robbery a few minutes before. I will begin by briefly restating the facts.

**I.**

Shortly after noon on Tuesday, February 12, 2013, Jonathan Klipa, an officer of the United States Capitol with twelve years of experience patrolling the streets of the Capitol Hill area, heard a Metropolitan Police Department (MPD) radio call that alerted him to a recent street robbery with a gun. Officer Klipa testified that "I heard the location of which way he was headed, and I just went down D Street, thinking that if he comes south he's going to come up around 4th — 4th or 5th Street." He further testified that he was looking for "[a] white car with tinted windows." Following up on his appraisal of what the robbers might do, he was proceeding east on D Street, N.E., around Third and Fourth Streets, at about 12:15 p.m., when he spotted at Fifth and D Streets, N.E., a white Chevrolet Lumina with four doors and tinted windows headed south.

There had been, in fact, two highly similar robberies that had been the subject of radio lookouts minutes before Officer Klipa spotted the white Chevrolet Lumina. The first robbery took place in the 1500 block of Maryland Avenue, N.E., near where Maryland Avenue, H Street, Fifteenth Street and Benning Road, N.E., meet, shortly after 12:00 noon, and the second at Eighth and H Streets, N.E., at about 12:12 p.m.

The first street robbery of a man selling single cigarettes, Michael Prince, led to an alert at 12:05 p.m. for "possibly a white Mercury Sable" which had left eastbound on Maryland Avenue. It is reasonable to infer from what happened next that the car soon changed directions and went to Eighth and H Streets, N.E., less than ten blocks west of the scene of the first robbery. After the subsequent 12:12 p.m. robbery at Eighth and H Streets, N.E., of Ezell Whitaker, a second man selling single cigarettes, Officer Frank Brown, a witness to that robbery, broadcasted a second lookout for a white car with tinted windows headed northbound on Seventh Street, N.E. Inferentially, and as Officer Klipa had anticipated, the white car with tinted windows changed directions again before Officer Klipa first saw it, a Chevrolet Lumina, as it headed south on Fifth Street at D Street, N.E., approximately three minutes after the second robbery. Officer Klipa followed it until, another three minutes later, at 12:18 p.m., the police stopped the white Chevrolet Lumina with tinted windows at the corner of Eleventh Street and Independence Avenue, S.E. Appellants were in it, as well as the driver, Patrick Buckmon, and victim Whitaker's backpack.

**II.**

**A.**

The brief foregoing statement of undisputed facts of record contradicts appellant Armstrong's contention that the police quickly launched a "dragnet" search of a large part of the District of Columbia.[1] The entire area covered by the above description of events from the robberies to the spotting of the white vehicle is only about twelve blocks from east to west and six blocks from north to south. Even if appellants' vehicle travelled a bit beyond that area before doubling back, it could not have been very far beyond it because of the extremely short time that elapsed from crime to crime to stop.

It is doubtless true, as the majority opinion states, that the sum of the two vehicle lookouts given by Lieutenant Bedlion and Officer Brown, "describ[ing] the suspects' fleeing vehicle as a white car, possibly Mercury Sable, with tinted windows and two black males . . . . without more, lacks the particularized

---

[1] The stop of the white car in this case was not a "dragnet" search in the sense in which that term was used in *In re A.S.*, 614 A.2d 534 (D.C. 1992), which dealt with the seizure of three youths who resembled a generalized description. The stop here was of a white American car with tinted windows, as mentioned in a lookout, which was traveling away from the scene of an armed robbery that had occurred about three minutes earlier some seven blocks away. We add that the term "dragnet," as defined in dictionaries in reference to police work, does not connote overly aggressive or unconstitutional police work — rather it means "a system in which the police look for criminals using systematic and thorough methods." Black's Law Dictionary 601 (10th ed. 2014).

specificity necessary to warrant the stopping of any vehicle within the District."[2]
Majority Op. at 13.  But here there was much more.

First, when Officer Klipa caught sight of the car approximately three minutes after the second robbery, it was being driven south on Fifth Street, N.E., just where and when it would have been if the driver had headed north a short distance on Seventh Street[3] immediately after second robbery, turned west for a few blocks, and then proceeded south on Fifth Street.

Second, the above description does not take into account additional details known to the police that matched the car that Officer Klipa spotted at Fifth and D Streets, N.E.  Specifically, the police had also learned that the white car that was "possibly a Mercury Sable" was an older four-door model.[4]  Although the record

---

[2]  The majority states that the government first raised the tinted windows feature on appeal.  Majority Op. at 6 n.6.  But the record shows otherwise.  The government in its September 18, 2013, Opposition to Defendant's Motions to Suppress, argued that "[t]he officers here had reasonable and articulable suspicion to justify stopping the vehicle as it matched the two lookouts broadcast over MPD radio of a *white four-door sedan with tinted windows*." (Emphasis added).

[3]  The robbery of the victim Whitaker took place at Eighth and H Street, N.E., but appellant Joiner fled to Seventh Street before getting in the white car.

[4]  The majority points out that other testimony — namely that the car could have been a Chevrolet — was impeached.  Majority Op. at 5 n.5.  But, "in deciding
(. . . continued)

does not establish conclusively whether Officer Klipa knew of this information or which lookouts — or parts thereof — he heard over the MPD radio, this court has held that even when officers making a stop "did not themselves possess sufficient information to justify a *Terry* stop," the collective knowledge of the police "provided the requisite reasonable grounds for the stop." *In re M.E.B.*, 638 A.2d 1123, 1129, 1131 (D.C. 1993) (also stating that "[t]he collective knowledge doctrine is firmly established in this jurisdiction in a line of cases going back at least thirty years" (internal quotation marks omitted)).

Third, the reasoning of the majority is premised in part on the supposition that there was a substantial probability that other similar white older American cars were being driven south on that street at that very time and place. That assumption does not contribute to a basis for a reversal. Fifth Street, N.E., at that point is a street in a residential neighborhood, rather than a thoroughfare, even though it may be proximate to "the busy H Street corridor." Majority Op. at 25. Moreover, there is no reason to conclude based on the record or on common knowledge that older midsized white American sedans like a Sable or a Lumina with tinted windows and

---

(. . . continued)
whether the motion to suppress was properly denied, we may of course consider all the evidence at the suppression hearing as well as the undisputed trial testimony." *West v. United States*, 604 A.2d 422, 427 (D.C. 1992).

four doors constituted a sizeable percentage of cars traveling south in that place and at that time of day. Cars of American makes constitute only a portion of the cars seen driving on the streets of the District of Columbia, and older *white* American sedans with tinted windows and four doors are only a subset of such vehicles.

Fourth, only one other car was stopped during the minutes that the lookouts were in play, and that car was a Toyota Camry. No other American car was pulled over during the so-called "dragnet." This fact too supports a conclusion that the police response to two street robberies was reasonable.

**B.**

The majority cites the opinion of the Maryland Court of Appeals in *Cartnail v. State*, 753 A.2d 519, 531 (Md. 2000), in support of its decision to "reject the idea that the designation of a 'white Mercury Sable' as the getaway car provides police with sufficient particularized suspicion to justify the stop of any white 'American sedan.'" Majority Op. at 16-17. The stark contrast between the facts in *Cartnail* and those in this case serves to demonstrate why the stop of the car involved here was in accordance with law.

*Cartnail* dealt with the stop of a gold-colored Nissan by Frederick, Maryland, police who received a report that a motel in that city had been robbed and that three suspects were fleeing from the scene of the robbery "in an unknown direction driving a gold or tan Mazda." *Id*. at 522. More than an hour and fifteen minutes after the robbery police stopped a gold-colored Nissan with two occupants in a different part of the city about two miles from the scene of the robbery. *Id*. at 522 n.1, 524. The court rejected the state's argument that the description of the make and color of the vehicle sufficiently narrowed the group of travelers who might be suspected.

In doing so, the court stressed the importance of the large size of the area in which the suspects might have been found one hour and fifteen minutes after the robbery, and also pointed out that LaFave "has noted that a significant difference exists between spotting a suspect within minutes of a crime, as opposed to an hour later, because ''the time and spatial relation of the 'stop' to the crime' is an important consideration in determining the lawfulness of the stop.'" *Id*. at 531-32 (quoting 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4 (g), at 204 (3d ed. 1996 and 2000 Supp.)).

This observation by the Maryland Court of Appeals underscores the strongest factor that supports our sustaining the trial court's ruling before us, a reason that distinguishes sharply this case from the case before the Maryland court. Officer Klipa spotted the white American sedan with tinted windows traveling south away from the scene of the second robbery about three minutes after the robbery took place and about seven blocks to the southwest of the robbery scene that the white sedan had left while, at that moment, going north. The fact that the white car with tinted windows left the scene of the second robbery going north from H Street on Seventh Street, N.E., fits well with the fact that three minutes later it was seen going south on Fifth Street, N.E., a concrete fact that the experienced Officer Klipa had anticipated. It cannot be assumed that fleeing robbers will travel in a straight line. Driving north for a short distance, turning west a few blocks, and then turning south on Fifth Street, would have put, and obviously did put, the white American car just where Officer Klipa spotted it some three minutes later.

The route the white American car took after being spotted demonstrates that it was not being driven in a straight line. However, as the trial judge found, it did not appear to be fleeing or engaging in any conduct that itself would give rise to a traffic stop. In other words, it can readily be inferred that the car was being driven

in the way the driver had planned — which was not in a straight line away from the scene of the second robbery.

It is also pointed out that Officer Klipa did not identify the car when he spotted it by alluding to the race of the occupants. He referred only to the number of occupants he saw through the tinted windows of the white car. It is thus clear from the record that the car was spotted and followed not on the basis of the race of the occupants of the car, but on the basis of the description of the car and the time, distance and direction from the second robbery.[5]

The facts of this case were highly incriminating, and afforded ample grounds for stopping the car.

I respectfully dissent.

---

[5] *Cartnail,* 753 A.2d at 530 (stating that "[i]n looking at the description of the suspects, undoubtedly physical characteristics, such as race, gender, ethnicity, hair color, facial features, age, body build, or apparel of a suspect permits winnowing of innocent travelers" (citing LaFave, *supra*, § 9.4(g), at 195-96)).