Opinion for the court by Associate Judge Fisher.
*1262 Opinion by Associate Judge Beckwith, concurring in part and dissenting in part, at page 1268.
Fisher, Associate Judge:
Appellant Nathan Jackson appeals his convictions for assaulting and robbing Cor-inthea Thompson. He primarily argues that the trial court erred in denying his motion to suppress because the police seized him for a show-up based on an “anonymous” and “uncorroborated” tip provided by the victim’s mother. He also mounts a facial challenge to the 2013 version of D.C. Code § 22-4504 (a), contending it violated the Second Amendment by banning the carrying of pistols in public. We reject these arguments and affirm his convictions.
I. Background
Evidence at the suppression hearing showed that shortly after noon on July 9, 2013, appellant Nathan Jackson approached Corinthea Thompson as she was walking down the street and demanded, “[g]ive up your shit.”[1] When she refused, appellant struck her on the head with a “silver and black-colored handgun,” knocking her unconscious, before stealing her watch and gold necklace. Officer Dion Smith arrived shortly thereafter, as did the victim’s mother, who spoke with both her daughter and the officer. The victim told Officer Smith that the robber was “a dark-complected, black male,” anywhere from five feet ten inches to six feet in height, 150 to 160 pounds, “with dread locks” and a thin build.
Approximately forty-five minutes to an hour after the robbery, the victim’s mother, Shirley Thompson-Wright, called the police “for a second sighting as to where the suspect was in reference to her daughter’s robbery.” [2] Officer Stephen Chih, who “had heard about the robbery,” responded to the intersection of 35th and East Capitol Streets. When Officer Chih arrived, the victim’s mother was “cursing,” “yellingU and screaming,” saying that “the suspect was up in that apartment right now” and that if the police “don’t go in there, I’m going to go in there and handle whatever I got to do.” She provided the address 3425 East Capitol Street, apartment 301.
Officer Chih asked the victim’s mother, Ms. Thompson-Wright, to calm down and to tell him “specifically what [wa]s going on,” because he had not yet learned the particulars of the robbery (such as the victim’s description of the robber). Ms. *1263 Thompson-Wright explained when and where her daughter had been robbed, and told him she had a picture of the suspect. She then gave Officer Chih a photograph which depicted a “[b]lack male, dark complected, with dreadlocks.” She also told him she had received the photograph “from the neighborhood” but had not witnessed the robbery. Officer Chih then requested “other units to respond.”
After backup units arrived, Officer Chih left Ms. Thompson-Wright with other officers and turned his attention to locating the suspect. Accompanied by Officer Curt Bonney, he went up to the third floor of the apartment building with the photograph tucked in his uniform shirt and the understanding that “[tjhere was still a suspect outstanding with a firearm.”
When Joyce Lewis answered the officers’ knock, they explained that a crime of. violence “had occurred earlier in the da/’ and “that there was information that a potential suspect was in her apartment.” They asked whether any males were in the apartment, and Ms. Lewis said that only her son was there. Showing the photograph to Ms. Lewis, Officer Chih asked if that was her son. She replied that it was not, but did not indicate that she knew the person in the photograph or tell the officers that he was present.
Ms. Lewis invited the officers inside, and her son Craig Lewis came to the door. It was apparent to Officer Chih that Craig Lewis was not the person in the photograph. The officers requested Craig’s identification and asked whether anybody else was inside. Craig said his identification was back in the bedroom, and Ms. Lewis and Craig indicated “that there was ... nobody else inside the apartment.”
Following Craig to the bedroom, the officers were “surprised” to find “two other subjects” inside — the appellant and his brother, Rico Jackson. Appellant appeared “[v]ery nervous,” and was “[w]ide eyed, kind of breathing a little bit heavy, constantly staring at his brother, back and forth, making eye contact with his brother.” The brothers looked like each other and looked like the photo. Noting that appellant’s brother Rico had a facial tattoo that was not depicted in the photograph, however, Officer Chih focused on appellant as the primary suspect. His suspicion solidified before the show-up procedure, when Craig Lewis told him that Rico had spent thé night at the apartment, but appellant had just come in 15-20 minutes before the police arrived.
Officer Chih told appellant not to make any sudden moves and asked for identification. When appellant stated that his ID was in his wallet in his back pocket, the officer told him to stand up very slowly and remove it. Officer Chih also told appellant he was going to “pat him down for any type of weapons.” The pat-down revealed no weapons, but Officer Chih noticed a white, plastic bag directly underneath where appellant had been sitting. Picking up the bag, Officer Chih immediately could feel that it contained expended shell casings.
The atmosphere became “[v]ery tense,” and based on “the nature of the original crime,” “the demeanor of both Nathan and Rico Jackson being very intense,” and the fact that Ms. Thompson-Wright had predicted the officers would find the robber there (despite the Lewis’s denials), Officer Chih alerted the other officers that there was “potentially a gun in [the room.]”
Without investigating further, Officer Chih left the room “to coordinate [a] show-up identification process” because an eyewitness to the crime had been found. (It seems that Ms. Thompson-Wright may have told the police about the witness, Ms. Matthews, while Officer Chih was upstairs *1264 with appellant.) Officers Lavern Miller and Shaquinta Gaines remained in the room, but appellant began acting suspiciously. Pretending to be tired, he laid back and began reaching underneath the sheet at the head of the bed. Officer Miller said, “I know what you’re doing. You need to stop moving and sit up right now.” Appellant complied. After Officer Chih took appellant outside for the show-up, Officer Miller “pulled back the sheet from where Nathan Jackson was reaching” and found “a silver and black-colored handgun ... [with] six[, live] rounds in the magazine.”
Outside, Ms. Matthews “immediately” identified appellant as the “man who had the gun and was robbing the girl.” Officer Chih then arrested appellant; as he returned to the apartment, he heard “a radio transmission” revealing that Officer Miller had found the weapon. The officers then obtained written consent to search the apartment from both Joyce Lewis and Craig Lewis. That search revealed the expended cartridge casings, the firearm and ammunition, and clothing that matched the victim’s description of the robber’s attire. The police did not find Corinthea Thompson’s watch or necklace.
On January 29, 2014, appellant’s trial commenced before the Honorable John McCabe, and on February 7, 2014, the jury found appellant guilty of armed robbery, assault with a dangerous weapon (“ADW”), and other charges related to the firearm and ammunition.[3]
II. Fourth Amendment
Appellant argues that the trial court should have granted his motion to suppress the identification by the eyewitness and the physical evidence found in the apartment because the police did not have reasonable articulable suspicion to detain him. He asserts that the information Ms. Thompson-Wright gave to the police (1) “amounted to an anonymous tip” because it was “attributed” to “the neighborhood grapevine” and (2) was not sufficiently corroborated.
A. Standard of Review
When reviewing the denial of a motion to suppress, we “must defer to the court’s findings of evidentiary fact and view those facts and. the reasonable inferences therefrom in the light most favorable to sustaining the ruling below.” Joseph v. United States, 926 A.2d 1156, 1160 (D.C. 2007). “The court’s legal conclusions on Fourth Amendment issues ... are ‘subject to de novo review.’” Id, When conducting that de novo review, however, we “give due weight to a trial court’s finding that the officer was credible and [that] the inference [he drew] was reasonable.” Ornelas v. United States, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
B. Reliability of the Tip
“The touchstone of the Fourth Amendment is reasonableness ... measured in objective terms by evaluating the totality of the circumstances.” Goines v. United States, 964 A.2d 141, 144 (D.C. 2009) (internal quotation marks omitted). “[I]n keeping with the Fourth Amendment,” Howard v. United States, 929 A.2d 839, 845 (D.C. 2007) (internal quotation marks omitted), the police may conduct a brief, investigatory stop of a suspect if they “have [a] reasonable suspicion, grounded in specific and articulable facts, that [the] person they encounter was in *1265 volved in or is wanted in connection with a completed felony.” United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).
Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.
Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Nevertheless, the reasonable suspicion standard “requires at least a minimal level of objective justification for making the stop.” Wilson v. United States, 802 A.2d 367, 369 (D.C. 2002) (internal quotation marks omitted). That is, the police “must have more than an ‘inchoate and unparticularized suspicion or hunch of criminal activity.’ ” Howard, 929 A.2d at 845 (citation omitted).
Here there was no doubt that a crime had occurred — very recently, and nearby. The issue is whether the police had a reasonable, particularized suspicion that appellant was the assailant.
“Prior to 1983, cases involving informant' tips were analyzed under a somewhat rigid and mechanical two-pronged analysis — the Aguilar-Spinelli test.” Goldston v. United States, 562 A.2d 96, 98 (D.C. 1989).[4] That test required an adequate showing as to “both the veracity or reliability of the informant and the informant’s ‘basis of knowledge’ for the information.” Id. In Illinois v. Gates, however, the Supreme Court rejected this “rigid” test, noting that “[^Informant’s tips, like all other clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability.” 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted). A tip can be a sound basis for forming reasonable articulable suspicion or probable cause even if it “might well not have survived the rigid application of the ‘two-pronged test’ that developed following Spinelli.” Id. at 242, 103 S.Ct. 2317 n.12.
Courts must now focus on “the overall reliability of a tip.” Gates, 462 U.S. at 233, 103 S.Ct. 2317. See generally Navarette v. California, — U.S. -, 134 S.Ct. 1683, 1688, 188 L.Ed.2d 680 (2014) (“Even assuming for present purposes that the 911 call was anonymous, ... we conclude that the call bore adequate indicia of reliability for the officer to credit, the caller’s account.”). Reliability is evaluated under the “totality of the circumstances” — a “practical, nontechnical” process' that leaves room for law enforcement officers to “formulate[ ] certain common-sense conclusions about human behavior.” Gates, 462 U.S. at 231-32 103 S.Ct. 2317 (internal quotation marks omitted); see also United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L,Ed.2d 621 (1981) (the evidence “must be seen and weighed not in terms of library analysis by scholars,, but as understood by those versed in the field of law enforcement”).
We recognize, for example, that “[a] person who ... voluntarily comes forward and identifies himself or herself, is more likely to be telling the truth.” Brown v. United States, 590 A.2d 1008, 1016 (D.C. 1991). Moreover, “corroboration through other sources of information reduce[s] the chances” that an informant is simply telling “a reckless or prevaricating tale.” Gates, 462 U.S. at 244-45, 103 S.Ct. 2317 *1266 (internal quotation marks omitted). When there are “supplemental” indicia of reliability, “[tjhis court’s post-Gates decisions” need not, and therefore “do not always discuss, or even mention, the source’s basis of knowledge.” Joseph, 926 A.2d at 1165.
C. Validity of the Seizure
The police did not need reasonable, ar-ticulable suspicion to approach the apartment, or even to enter it. As the evidence showed, the residents consented to the entry. Therefore, the trial court properly found that “there was no fourth amendment violation by the[ police] walking into the apartment.” Judge McCabe also found that the police had reasonable articulable suspicion when they subsequently detained appellant because “[o]nce the door to the ... bedroom opened” to reveal appellant, “[the] tip has panned out.”
The court concluded that even though there “was fairly thin information as to the basis for the information that Officer Chih was given by the complainant’s mother,” the fact that appellant was where she had predicted he would be, the fact that he matched the photo, and “the fact that the police were told by Mr. and Ms. Lewis that there were no other males in the apartment” justified the officer’s brief detention of the defendant for a show-up.[5]
To determine the permissibility of that detention, we turn first to the tip that led the officers to the apartment building. When evaluating Ms. Thompson-Wright’s “credibility and veracity,” In re S.B., 44 A.3d 948, 952 (D.C. 2012), we emphasize that her interactions with the police were not anonymous. She identified herself; was present before, during, and after the police investigation of her tip; and “could be held ‘accountable’ for the information [s]he gave.” Joseph, 926 A.2d at 1160. Thesé facts remove the case from the “Florida v. J.L. line of cases involving unidentified informants.” Id. at 1162.
“[I]nformation from an identified citizen is presumptively reliable[,]” and “rigorous scrutiny of the basis of [her] knowledge [was] unnecessary.” Id. at 1161 (emphasis added) (internal quotation marks omitted). “[T]here was nothing in this case to suggest that [Ms. Thompson-Wright] had any bias or motive to falsify information.” Id. at 1164. To the contrary, she was the understandably angry mother of the hospitalized victim, and her clearly expressed interest was in finding and dealing with her daughter’s assailant. Even so, the fact that Officer Chih knew relatively little about the basis of Mrs. Thompson-Wright’s information before he detained appellant makes this a closer case. It is especially because the police had other “strong showing[s] of veracity [and] some other indicia of reliability” that we uphold the detention. Id. at 1165.
Although the police knew only that Ms. Thompson-Wright’s information came from “the neighborhood,” the photograph and address she provided indicate “a special familiarity with [appellant’s] affairs” that the general public would be unlikely to have. White, 496 U.S. at 332, 110 S.Ct. 2412. Even if we were to consider her only “a conduit” for the information she had gathered, Officer Chih independently corroborated important details of the tip. A consensual entry into Ms. Lewis’s apartment revealed that appellant was precisely where Ms. Thompson-Wright said he would be. “[A]n informant [who] is shown to be right about some things, ... is prob *1267 ably right about other facts that he has alleged.” Id. at 331-32, 110 S.Ct. 2412. Although the prediction regarding appellant’s location was based on information provided by Chucky (an informant unknown to the police), the fact that the information turned out to be correct enhanced the overall reliability of the tip.
We should not ignore the corroborative circumstances under which Ms. Thompson-Wright’s tip “panned out.” Ms. Lewis had. denied that anyone else was in the apartment, yet the police discovered appellant and his brother in the bedroom. Both were behaving nervously. Appellant tries to dismiss this behavior by asserting that nervousness “is an entirely natural reaction” to the presence of law enforcement and that Ms. Lewis might have “had any number of reasons” to give the police a “single inaccurate statement.”
Even if these assertions were true, “[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct.” United States v. Arvizu, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Instead, Officer Chih reasonably could suspect that Ms. Lewis and her son had been trying to mislead the police so they would not find appellant and his brother and that appellant’s nervousness reflected his fear of being caught— both reasonable possibilities which lent further credence to Ms. Thompson-Wright’s tip. The justification for detaining appellant was markedly enhanced when Officer Chih learned (before taking him to the show-up) that appellant had recently arrived at the apartment (making it more likely that he was out in the neighborhood at the time of the robbery).
Assessing the totality of these circumstances, the trial court properly avoided the “sort of divide-and-conquer analysis” in which appellant engages. Arvizu, 534 U.S. at 274, 122 S.Ct. 744. It did not err in concluding that the police acted reasonably in commanding appellant not to make any sudden moves, in patting him down to check for weapons, and in detaining him until the show-up procedure was complete. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (holding that an officer “making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect ... [and] he may conduct a weapons search limited in scope to this protective purpose.”); Womack v. United States, 673 A.2d 603, 608 (D.C. 1996) (holding that a “temporary detention, designed to last only until a preliminary investigation [here, the show-up identification procedure] either generate[d] probable cause or resulted] in the release of the suspect” is consistent with the Fourth Amendment) (internal quotation marks omitted).
III. Did the Statute Clearly and Obviously Violate the Second Amendment?
Appellant contends that we should vacate his conviction for carrying a pistol outside his home or place of business (“CP”) because former D.C. Code § 22-4504 (a) was facially unconstitutional. In other words, he asserts that no (valid) statute prohibited him from carrying the pistol.
As we explained in Conley v. United States, “[a] facial challenge imposes a ‘heavy burden’ on the claimant to establish that ‘the law is unconstitutional in all of its applications.’ ” 79 A.3d 270, 276-77 (D.C. 2013). “[W]e do not examine whether appellant’s conduct could have been criminalized under a hypothetical statute,” but appellant “must demonstrate that the terms of the statute ... contain[ ] a constitutional infirmity that invalidates the stat *1268 ute in its entirety.” Id. at 277 (internal quotation marks omitted).
The operative portion of the CP statute applicable at the time of this armed robbery stated: “No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed.” D.C. Code § 22-4504 (a) (2013), (In that iteration, the statute did- not mention a license.) The relevant penalty section provided: “A person who violates this section by carrying a pistol, or any deadly or dangerous weapon, in a place other than the person’s dwelling place, place of business, or on other land possessed by the person, shall be fined ;.. or imprisoned .... ” D.C. Code § 22-4504 (a)(1) (2013).
As appellant did not challenge the statute before the trial court, we review for plain error. Lowery v. United States, 3 A.3d 1169, 1172-73 (D.C. 2010). Under this test, appellant must show “(1) ‘error,’ (2) that is ‘plain,’ and (3) that affected appellant’s ‘substantial rights.’ Even if all three of these conditions are met, this court will not reverse unless (4) ‘the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.” Id. at 1173 (internal quotation marks omitted). “[Ajppellant bears the burden of persuasion on each of the four prongs of the plain error standard.” Id, In this context, “‘[p]lain’ is synonymous with ‘clear’ or, equivalently, ‘obvious.’” United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
A separate division of the court recently considered and rejected the same attack upon the same statute. In re T.M., 155 A.3d 400 (D.C. 2017). For the reasons stated there, “the statute was not so clearly and obviously unconstitutional as to support reversal on plain error grounds.” Op. at 407-08.[6]
IY. Conclusion
We remand with instructions to vacate appellant’s conviction for ADW and the corresponding PFCV conviction. In all other respects, the judgment of the Superior Court is hereby affirmed.

. Citing Dockery v. United States, the government states that we may consider "both evidence offered at the suppression hearing and [evidence] admitted at trial.” 853 A.2d 687, 694 (D.C. 2004) (internal quotation marks omitted). Other precedent seems to hold that, if we look outside the record of the hearing, we are limited to considering "undisputed trial testimony.” See West v. United States, 604 A.2d 422, 427 (D.C. 1992). Because the evidence presented at the suppression hearing is sufficient to sustain the trial court’s ruling, we need not resolve this issue.

. At the time, the police did not know that, after speaking to her daughter at the crime scene, Shirley Thompson-Wright initiated her own investigation. The victim had told her mother that her assailant was the "boy from around the neighborhood that always drove the red car and that always hung out with ... Chucky.” Ms. Thompson-Wright then drove "around the neighborhood” and encountered Rogann Matthews, a neighbor who had (1) witnessed the assault and robbery, and (2) knew where Chucky lived. This information led Ms. Thompson-Wright to Chucky, who in turn gave her the address where appellant was staying: 3425 East Capitol Street. Chucky also pointed out a photo of appellant on his wall; Ms. Thompson-Wright grabbed the photo before leaving. Because the police did not know this information at the time they seized appellant, we do not rely on it when reviewing the denial of appellant’s motion. See note 1, above.

. The other charges decided by the jury included carrying a pistol, possessing an unregistered firearm, unlawful possession of ammunition, and two counts of possessing a firearm dufing a crime of violence or dangerous offense ("PFCV”). The trial court found appellant guilty of committing an offense while on release.

. See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

. The court also found that Officer Chih’s “frisk” of the bag "was really permissible under all of the circumstances,” as he did not open the bag but just felt the outside of it. Finally, Officer Miller’s decision to pull back the bed sheet was just “a very minor intrusion” that did “not violate Mr. Jackson’s fourth amendment rights.”

. Appellant also argues that his conviction for ADW, and the corresponding PFCV conviction, should merge with his conviction for armed robbery and the PFCV conviction associated with die armed robbery count. The government agrees, and so do we. We therefore remand the case to the trial court with instructions to vacate those two convictions, noting that the ADW and PFCV sentences run concurrently with the sentence for armed robbery.