*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-1126

DEANDRE J. POSEY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-4464-15)

(Hon. Juliet J. McKenna, Trial Judge)

(Argued May 15, 2018                    Decided February 21, 2019)

*Jennifer Williams*, with whom *Samia Fam* and *Shilpa S. Satoskar*, Public Defender Service, were on the brief, for appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Seth M. Gilmore*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and WASHINGTON, *Senior Judge*.

WASHINGTON, *Senior Judge*: Following a hearing on his motion to suppress tangible evidence and a stipulated bench trial, appellant Deandre J. Posey was convicted of unlawful possession of a firearm and related offenses. On appeal, Mr. Posey seeks reversal of his convictions on the ground that the trial court

erroneously denied his motion to suppress a handgun that was found on his person. He contends that the police lacked reasonable articulable suspicion to conduct a *Terry*[1] stop, and therefore, his Fourth Amendment rights were violated. For the reasons stated below, we agree with Mr. Posey and reverse his convictions.

## I.

At the suppression hearing, the government presented the testimony of Metropolitan Police Department Officer Michael Kasco. Officer Kasco testified that he and his partner, Officer Ron Orgel, received a radio run ("lookout") for a robbery at gunpoint in the unit block of M Street N.W. According to Officer Kasco, this first lookout contained a description of the suspect, "a black male dressed in all black." While responding to the scene, officers received a second lookout reporting that "it was a group of black males, and the group was last seen heading towards North Capitol" Street.

As Officers Kasco and Orgel arrived on the unit block of M Street, they saw "Sergeant Ritchie[] was already on the scene with the complainant." The officers

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

also observed a group of five or more black males mostly dressed in black jackets, on the same block as the complainant and their sergeant, walking towards North Capitol Street. Officer Kasco testified that "[i]t was a group that possibly may have been involved with the robbery" but admitted that the officers did not "know."

Aware that the patrol was in a predominately African-American neighborhood where groups "typically . . . just scatter" from police, Officer Kasco drove to within fifteen feet of the group that included Mr. Posey. The group briefly stopped, turned, and looked at the marked police cruiser. At the time they approached the group, nothing Mr. Posey did drew any particular attention to him. Officer Kasco testified that he did not observe Mr. Posey exchange anything with other members of the group, make any motions toward or to conceal his waistband, or do anything illegal. Officer Kasco's attention turned from the group to Mr. Posey only after Mr. Posey "took off running" and "Officer Orgel immediately jumped out of the" patrol car in pursuit.[2]

Shortly thereafter Mr. Posey was apprehended and handcuffed by Officer

---

[2] Officer Orgel did not testify at the suppression hearing.

Orgel because the "lookout was for an armed robbery with a gun." Officer Kasco then came up, conducted a *Terry* pat down for safety, and found a handgun in Mr. Posey's front waistband. Mr. Posey did not resist and was not identified as the armed robber during a subsequent show-up identification with the victim. According to Officer Kasco, the entire encounter – from the time officers drove up to the scene to the time the show-up identification was conducted – took place within "[f]ive to ten minutes" of the second lookout.

In denying Mr. Posey's suppression motion, the trial court admitted that it was a close question. First, the trial court recognized that the description of the suspect was "quite vague" and there was a valid concern "about the ability of the police to act on such a generalized description." It determined, however, that the particular circumstances of this case were sufficient to overcome such vagueness because Mr. Posey was located "a block away, within five to ten minutes after the crime had been reported." The trial court then found that Mr. Posey was the only member of his group to flee when officers arrived "in their marked squad car in full uniform," without any "demonstration that it was their intent to approach that group of individuals." Based on these facts, the trial court made the "difficult" determination that there was reasonable articulable suspicion for the police to stop Mr. Posey on suspicion of robbery.

Following the suppression hearing, Mr. Posey entered into a stipulation agreement admitting to the facts related to the handgun found on his person during the stop. As a result of the stipulation, Mr. Posey was found guilty of four offenses. The trial court suspended his sentence pending this appeal.[3]

## II.

"When reviewing the denial of a motion to suppress, we must defer to the [trial] court's findings of evidentiary fact and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling below." *Jackson v. United States*, 157 A.3d 1259, 1264 (D.C. 2017) (internal quotation marks omitted). Whether officers had reasonable suspicion to justify a stop is a

---

[3] Mr. Posey was found guilty of carrying a pistol without a license outside a home or place of business by a convicted felon, in violation of D.C. Code § 22-4504 (a)(2) (2012 Repl.), unlawful possession of a firearm by a convicted felon, in violation of D.C. § 22-4503 (a)(1) (2012 Repl.), possession of an unregistered firearm, in violation of D.C. Code § 7-2502.01 (a) (2012 Repl.), and unlawful possession of ammunition, in violation of D.C. Code § 7-2506.01 (3) (2012 Repl.). He was sentenced to fourteen months' incarceration for count 1, thirty-six months' incarceration for count 2, ninety days' incarceration for count 3, and ninety days' incarceration for count 4, all to run concurrently, and three years of supervised release, stayed pending the outcome of this appeal pursuant to D.C. Code § 23-1325 (c) (2012 Repl.).

question of law that we review de novo. *Miles v. United States*, 181 A.3d 633, 637 (D.C. 2018). Our limited review must ensure that the prosecution has shown a constitutionally sufficient basis for stopping Mr. Posey. *See Pridgen v. United States*, 134 A.3d 297, 302 (D.C. 2016); *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013). "When the trial court wrongfully denies a motion to suppress, reversal is necessary unless the error was harmless beyond a reasonable doubt." *Armstrong v. United States*, 164 A.3d 102, 107 (D.C. 2017).

## III.

It is firmly established that, pursuant to *Terry*, "[o]fficers may conduct an investigatory stop if they have a reasonable suspicion based on specific and articulable facts that criminal activity may be occurring." *Wade v. United States*, 173 A.3d 87, 91 (D.C. 2017) (internal quotation marks omitted). Put differently, "[a]n officer may not rely on unparticularized suspicion and inarticulate hunches to conduct an investigatory stop, nor may he rely on his subjective good faith." *Pridgen*, 134 A.3d at 301 (internal quotation marks and brackets omitted).

In considering whether reasonable articulable suspicion existed, we "must consider the totality of the circumstances, as viewed through the eyes of a

reasonable and cautious police officer on the scene, guided by his experience and training." *Henson v. United States*, 55 A.3d 859, 867 (D.C. 2012) (internal citation and quotation marks omitted). Multiple factors may contribute to the totality of the circumstances, "including the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Singleton v. United States*, 998 A.2d 295, 300 (D.C. 2010). Even recognizing that "the observing police officer may see a combination of facts that make out articulable suspicion," *Jacobs v. United States*, 981 A.2d 579, 581 (D.C. 2009), we are unable, on this record, to conclude that the stop in this case was based on anything more than a good faith hunch by Officer Kasco's partner, Officer Orgel. *See Pridgen*, 134 A.3d at 301.

The lookouts Officers Kasco and Orgel received described the robbery suspect as a black male dressed in all black, traveling in a group of black males in the direction of North Capitol Street from the unit block of M Street. We have repeatedly emphasized "the difficulty we have supporting a finding of particularized reasonable suspicion when a lookout description is limited to a person's race and a generic clothing color description, especially when more than one suspect is indicated or there are other persons in the vicinity." *Armstrong*, 164

A.3d at 108; *see, e.g.*, *id.* at 108-09 (citing cases).  Our difficulty is compounded here because Mr. Posey was one of several members of his group matching the generic description given of a black man in black clothing.[4]  *See In re T.L.L.*, 729 A.2d 334, 340 (D.C. 1999) ("Without identifying information with respect to height, weight, facial hair or other distinguishing features, this description could have fit many if not most young black men.").  The additional description of a group of black men walking towards North Capitol Street adds little specificity in a neighborhood that Officer Kasco described to the trial court as predominately black.  *See In re A.S.*, 614 A.2d 534, 540 (D.C. 1992) ("To allow seizure of . . . people on the basis of a generalized description that would fit many people is directly contrary to the central teaching of . . . Fourth Amendment jurisprudence." (internal quotation marks omitted)).

---

[4]  We acknowledge that the discrepancy between Mr. Posey's jeans and the description of the suspect's all black clothing is relevant to reasonable suspicion. Ordinarily, "[t]he fact that a part of the description does not fit is . . . a negative factor." *Brown v. United States*, 590 A.2d 1008, 1018 (D.C. 1991).  However, we do not consider this discrepancy here because the trial court found that Officer Kasco's testimony about inadequate lighting conditions in the area was sufficient to support a reasonable belief that Mr. Posey was dressed in all black at the time he was stopped.  *Cf. id.* ("[M]istakes are irrelevant if there is sufficient particularized information . . . ." (internal quotation marks omitted)).

We of course recognize that diligent investigating officers arriving at this scene may have taken a legitimate interest in Mr. Posey's group based on the two lookouts. But we must emphasize that developing such an interest is only the beginning of their work. *See Terry*, 392 U.S. at 5-7, 27-28 (describing a piqued interest, leading to observations, yielding facts justifying a stop). Officers with minimal information are permitted to approach people to investigate their hunches. *See, e.g.*, *Pridgen*, 134 A.3d at 303. But approached individuals are free to refuse to speak with officers or avoid them altogether. *See, e.g.*, *Brown*, 590 A.2d at 1019 ("Citizens have no legal obligation to talk to police."). Officers must then continue to establish facts corroborating reports from the public and build on their hunches by other means. *See, e.g.*, *Jackson*, 157 A.3d at 1262-64 (describing step-by-step investigation of information, identifying a suspect, whose actions during the investigation justified a search). We thus require officers to make observations to develop their legitimate circumstantial hunches into articulable suspicion that the individuals they choose to stop are engaged in criminal activity. *See Wade*, 173 A.3d at 91; *Jackson*, 157 A.3d at 1264-65; *Pridgen*, 134 A.3d at 303. No evidence in our record suggests that the officers here completed the final investigative step prior to seizing Mr. Posey.

Just as Mr. Posey's presence in a group on the same block as the robbery some five to ten minutes after the crime was *reported* does not exclude him from suspicion, he correctly notes that his presence amongst such a group does not necessarily point the finger in his direction. The trial court found that Mr. Posey was discovered by the officers near the scene of the crime five to ten minutes after the report of the robbery but heard no testimony and made no findings about when the crime actually occurred. *See Bennett v. United States*, 26 A.3d 745, 754 (D.C. 2011) (recognizing that it takes "some amount of time" for reports of criminal activity to reach responding officers). These minimally proximate facts do not paint the picture brightly enough for us to afford them the seemingly dispositive weight assigned by the trial court. Because the officers did not make any observations fortifying the vague lookouts with specific probative facts describing this group in relation to the scene of the crime relative to the time that the robbery *occurred*, we conclude that they had no cause to cast any particular suspicion on this group or subsequently identify Mr. Posey as the robber due to his association with that group. *See, e.g.*, *Armstrong*, 164 A.3d at 111 ("Being alone in the area of the reported crime limits the universe of potential persons ensnared by a general description and strengthens individualized suspicion in any one person" while "[p]resence in a populated area . . . does the opposite."). We therefore cannot accept the government's invitation to infer that Officers Kasco and Orgel arrived in

close temporal proximity to the crime merely because they were in close spatial proximity to the scene when they heard the lookouts, headed to the crime scene, saw their sergeant already on the scene with the complainant, and found Mr. Posey in a group walking up the block on which the crime had at some earlier time occurred. *See, e.g.*, *In re T.L.L.*, 729 A.2d at 341 ("The generality of the descriptions of the robbers may not have been fatal if the accused had been apprehended immediately after the robbery at the location where the crime occurred.").

The government suggests that Mr. Posey's presence in a high crime neighborhood coupled with his flight from uniformed officers is enough to overcome the aforementioned deficiencies in the evidence before us. We harbor no doubt that more is required for officers to develop reasonable articulable suspicion of criminal activity justifying a stop.

While we cannot and do not say that encounters with police in a high crime neighborhood are irrelevant per se, we can accord no real significance to the nature of the neighborhood in this case. The government's reliance on *Illinois v. Wardlow*, 528 U.S. 119 (2000), is misplaced. The officers here were not alerted to the fact that a robbery was committed or may be under commission by observing

some indicia of criminal activity common in the area of their patrol. *See id.* at 121-22, 124-25; *Miles*, 181 A.3d at 640-41, 640 n.13; *James v. United States*, 829 A.2d 963, 968 (D.C. 2003). Rather, the officers were investigating a robbery that had already occurred and been reported with nothing more than a vague lookout description. Of far greater interest to our present inquiry is Officer Kasco's testimony that he did not observe any illegal activity or any indicia of illegal activity as the officers approached the group of men that included Mr. Posey. *See Henson*, 55 A.3d at 867.

Although the trial court appears to have found that Mr. Posey's subsequent flight from the group of men with whom he had been walking was not provoked by the officers' approach, unprovoked flight "is not necessarily indicative of [any particular] wrongdoing." *Wardlow*, 528 U.S. at 124 (2000). Flight is not merely a box that, once checked, automatically justifies a stop. Like any factor in our comprehensive analysis, flight is viewed in the context of the specific facts and corroborating circumstances of each individual case to determine whether officers had individualized and particularized suspicion to conduct a stop. *See, e.g.*, *Navarette v. California*, 572 U.S. 393, 397 (2014); *Miles*, 181 A.3d at 641.

We find no indication in the record before us that Mr. Posey's unprovoked flight added anything to Officer Kasco's minimal knowledge of Mr. Posey's relationship to the robbery then under investigation. Nothing about Mr. Posey's conduct prior to his flight or during Officer Orgel's pursuit supports a contrary finding. *Cf. Miles*, 181 A.3d at 641 ("[A]n individual may be motivated to avoid the police by a natural fear or dislike of authority, a distaste for police officers based upon past experience, an exaggerated fear of police . . . or other legitimate personal reasons." (internal brackets and quotation marks omitted)). Unlike those cases where flight contributes to reasonable articulable suspicion, Officer Kasco did not observe Mr. Posey doing anything illegal as the officers approached. *See Coghill v. United States*, 982 A.2d 802, 808 (D.C. 2009); *Howard v. United States*, 929 A.2d 839, 845-46 (D.C. 2007). Nor did Officer Kasco indicate that the manner of Mr. Posey's flight was itself suggestive of armed robbery. *Cf., e.g.*, *Wade*, 173 A.3d at 91 ("When the officers approached . . . Mr. Wade discarded a cellphone and placed his hand near his waist, just where the 911 caller said a gun would be."); *Pridgen*, 134 A.3d at 304-05 (explaining that the "articulable basis for suspicion that appellant was armed did not ripen into a reasonable suspicion . . . until the officers saw appellant drop the cellphone, decline to stop and retrieve it . . . hold his side as he ran upstairs," and "mov[e] his hand around his left pocket as he stood at the apartment unit door" while police in marked vests pointed their

guns at him and told him to get on the floor). If Officer Orgel developed knowledge of any other fact tending to identify Mr. Posey as the robber, the government did not present that information at the suppression hearing.

Under the totality of these circumstances, the officers approached the group and acted on a hunch short of the individualized and particularized knowledge needed to stop Mr. Posey on suspicion of robbery. We hold simply that a nondescript individual distinguishing himself from an equally nondescript crowd by running away from officers unprovoked does not, without more, provide a reasonable basis for suspecting that individual of being involved in criminal activity and subjecting him or her to an intrusive stop and police search.[5]

---

[5] We observe that the trial court did not specifically address Officer Kasco's testimony that he saw his sergeant with the complainant prior to spotting Mr. Posey's group *walking* up the same block, knew the block was in a predominately black neighborhood, and understood that groups in that area often "scatter" when approached by police. However, viewing these facts and the other uncontested testimony in the light most favorable to the government does nothing to undermine and supports our analysis that the officers in this case did not have enough information to form a reasonable articulable suspicion under the totality of the circumstances. *See Pridgen*, 134 A.3d at 302; *Robinson*, 76 A.3d at 335; *Henson*, 55 A.3d at 867.

**IV.**

Because we conclude that the officers lacked the particularized suspicion necessary to subject Mr. Posey to a *Terry* stop, the trial court erred in denying his motion to suppress. Without the firearm evidence discovered as a result of the illegal stop, Mr. Posey could not have been found guilty of the various weapons offenses for which he was convicted. Because the stipulated facts leading to Mr. Posey's conviction by the trial court were conditioned on the admission into evidence of the gun illegally seized from him, his convictions are reversed.[6]

*So ordered.*

---

[6] Mr. Posey also asks us to consider whether additional distinguishing information regarding the robbery suspect's physical description that the 911 operator allegedly possessed but did not broadcast to officers should have been considered under the collective knowledge doctrine. The government argues that the 911 call was not introduced at the suppression hearing and contests the proposition that a civilian 911 operator can be considered part of, and contribute to, the collective knowledge of law enforcement. While these arguments raise questions relevant to our inquiry, we need not address them here as we have already found error in the trial court's denial of the motion to suppress and reversed Mr. Posey's convictions. *See Armstrong*, 164 A.3d at 108 n.9.