AMY BERMAN JACKSON, United States District Judge
Defendant Delonte Bridges was charged in a one-count indictment with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Indictment [Dkt. # 1]. The firearm was recovered from defendant's waistband when he was stopped on October 21, 2018 by officers of the District of Columbia Metropolitan Police Department ("MPD"). Defendant moved to suppress the handgun, arguing that it was obtained in violation of the Fourth Amendment to the U.S. Constitution. Mot. to Suppress Physical Evid. [Dkt. # 9] ("Def.'s Mot.") at 4-6. The government opposed the motion, Gov't Opp. to Def.'s Mot. [Dkt. # 11] ("Opp."), and on May 8, 2019, the Court held an evidentiary hearing. Min. Entry (May 8, 2019); Tr. of Proceedings May 8, 2019 [Dkt. # 22] ("Tr.").
At the suppression hearing, the government presented the testimony of the MPD arresting officer, Merissa McCaw, and it submitted a montage of body camera clips from the arrest, still shots of those videos, photographs of the area where the events took place, and photographs of the defendant after he was detained and the firearm was discovered. See Gov't's Ex. List [Dkt. # 19].[1] Defendant introduced additional body camera footage and still shots taken from those videos. See Def.'s Ex. List [Dkt. # 18]. After the hearing, the parties submitted supplemental briefs in support of their positions. Def.'s Suppl. Mem. of Law Regarding Suppression of Evid. [Dkt. # 20] ("Def.'s Suppl."); Gov't's Suppl. to its Opp. to Def.'s Mot. [Dkt. # 21] ("Gov't's Suppl.").
Based upon its review of all of the evidence, the pleadings, and the relevant legal authorities, the Court will deny defendant's motion. Applying the decision of the Supreme Court in Illinois v. Wardlow , 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), the Court finds that the combination of all of the facts and circumstances, including the defendant's flight from police in a high crime area, were sufficient to give rise to the reasonable suspicion needed to initiate an investigatory stop. And there is no dispute that after the defendant was stopped, a firearm was visible and was recovered from his person.
FACTUAL BACKGROUND
Officer Merissa McCaw testified that on October 21, 2018, at approximately 4:30 *64 pm, she was in one of two cars driven by members of the MPD Gun Recovery Unit ("GRU") in the Sursum Corda neighborhood in the District of Columbia. Tr. at 4-6; 27:20-23. Officer McCaw was seated behind the driver of the first car, Officer Wright, and there were two other officers in that vehicle. Tr. at 6:13; 20:25-21:10. A second car with four more police officers followed immediately behind. Tr. at 6:11-15; 43:14-16. The cars were unmarked, but the eight officers wore police vests, and the videotapes reveal that the word "POLICE" was clearly visible across their chests. Tr. at 8:2-7; Def.'s Ex. 2, Minsak Body Camera, 20:35:54.[2] McCaw testified that at the time in question, they had entered what they understood to be a high crime neighborhood, with a "large amount of drug dealing." Tr. 25:16-18, 27:8-12. She also testified that although she did not remember the specific incident that prompted the decision to send her team to that location, they were dispatched by their superiors in the wake of a "firearms-related event" that occurred earlier that day or the night before. Tr. at 27:20-23; 48:1-14.
Officer McCaw testified that their car was initially driving eastbound on M Street Northwest, and then made a right turn, heading southbound onto the 1110 block of First Place Northwest, where a group of individuals were congregated. Tr. at 16:7-11; 22:21-23:2. As the car entered the block, someone yelled "Omaha," which is known to be a code word to indicate the presence of police. Tr. at 17:16-22. She stated that when she heard that word she began to watch the individuals on the block to see if anyone would react. Tr. at 20:7-14. She noticed that "[o]f the individuals that were standing in the block, only two people changed their behavior" - defendant and one other man separated from the group and began walking on the sidewalk head-on towards the officers' cars and away from the group. Tr. at 20-23.
Officer McCaw testified that as the two men walked by the first car, Officer Wright, who was seated directly in front of her, spoke to them from the open driver's window. Tr. 20:20-21:13. He "identified himself as the police and asked if everything was good." Tr. at 21:2-3. The individuals kept walking and did not respond. Tr. at 21:12-15. Officer Wright then stopped the car and got out, and according to Officer McCaw, "as he did so, Mr. Bridges took off running northbound, towards M Street." Tr. at 21:17-19; see also Tr. at 22:15-17 (Question by the prosecutor: "When Officer Wright exited the vehicle, was the defendant running at that time?" Answer: "As Officer Wright got out, Mr. Bridges took off running."); Tr. at 52:25-53:1 ("I saw Officer Wright get out and Mr. Bridges take off."). Officer Wright and the other officers pursued the defendant on foot, Tr. at 22:18-20, while Officer McCaw got out of the back seat and took over the vehicle. Tr. at 39:8-13.
The body camera footage reveals that the following events then took place. Police officers chased defendant down the First Place block and around the corner onto M Street Northwest. Officer Denton yelled several times: "Get on the ground now!" Def.'s Ex. 3, Denton Body Camera, 20:35:51. The defendant eventually complied and dropped to a prone position on *65 the ground with his arms outstretched above his head. Id. at 20:35:57. As Officer Denton approached the defendant on the ground, a firearm was visible on the left side of defendant's waistband. Id. The officer then took hold of the defendant while he was on the ground and ordered him to "turn on his stomach." Id. Another officer is overheard saying "1-800," id. at 20:35:59, which Officer McCaw testified is a code word for the presence of a firearm. Tr. at 38:2-3. Once defendant was placed in handcuffs and turned over to face the officers, the firearm is again visible in the videotape on the left side of his waistband. Gov't's Ex. 1, Anderson Body Camera, 20:36:39; Gov't Ex. 12, Crime Scene Photograph.
The facts are largely undisputed. Defendant did not object to the introduction of the testimony concerning why the officers had been directed to that location, and he does not dispute the characterization of the neighborhood as a high crime area. Tr. at 103:18-21; Def.'s Suppl. at 2. Nor does he dispute that someone yelled "Omaha," Tr. at 45:20-24; 97:5-8, or that he then began to walk away from the group, see 49:12-16, although he maintains that his actions at that point could not have been viewed as suspicious since he was walking towards, and not away from, the police cars headed in his direction. Tr. at 96:25-97:2. The defense does not dispute that Officer Wright referred to himself as "police" when he spoke to the defendant from the driver's window as the defendant was walking past the car on the sidewalk. Tr. at 98:9-15. (Question by the Court: "[T]hat put them on notice that they were the police. We agree to that[?]" Counsel for the defendant: "Right ...."). And most importantly, he does not dispute that he ran away from the police officers. Tr. at 97:15-17. Instead, the focus of the defense argument at the motions hearing was: who initiated the chase? Tr. at 102.
Counsel for the defendant asserted that the defendant did not run until after the officer "jumped out" of the car, and therefore, his flight was provoked. Tr. at 104:12-13; Def.'s Suppl. at 5. According to the defense, Officer Wright "ran out of [the] car," Tr. 96:5-6, and if the "police created the situation which ... caused Mr. Bridges to run," his flight was not indicative of consciousness of guilt and was not enough to justify the stop. Tr. at 102:24-103:12.
But the defendant did not testify, and he did not introduce any other witnesses to describe the manner in which Officer Wright exited the car. The only testimony on that point was provided by Officer McCaw:
QUESTION BY THE PROSECUTOR: Officer McCaw, when Officer Wright was getting out of the vehicle, did you have an opportunity to observe him?
A. Officer Wright or Mr. Bridges?
Q. Officer Wright.
A. Yes.
Q. Did Officer Wright pull his weapon?
A. No.
Q. How would you describe the demeanor when Officer Wright was opening the door?
A. Fairly calm.
THE COURT: Well, did he stop the car and essentially jump out, or he just pulled over and opened the door and ambled out?
THE WITNESS: It was somewhere between that casual ambling out and leaping out of the car. He sort of got out with a purpose, but I wouldn't say that it was leaping out.
THE COURT: Well, did he parallel park, or just pull the car over and got out?
*66 THE WITNESS: He stopped the car, put it in park and then got out.
Tr. 40:24-41:19.
Also, the defendant did not introduce any testimony on the question of who ran first. The only testimony in the record consists of Officer McCaw's multiple statements that the defendant took off "as Officer Wright got out" Tr. at 22:17 (emphasis added); see also Tr. at 21:17-19; 52:25-53:1.
In support of his claim that "[h]e did not run until an officer jumped out of his car," see Def.'s Suppl. at 5, defendant introduced Officer McCaw's body camera footage and several still images of certain moments shown on the video. Tr. at 96; Def.'s Ex. 1, McCaw Body Camera; Def.'s Exs. 7-9, Still Images. The McCaw video reflects that the lead car in which Officer Wright and McCaw were travelling had just turned the corner at 20:35:34, and Officer Wright stopped the car and he got out at 20:35:44, and that he almost immediately began to run. The defendant is not visible at any point in Officer McCaw's body camera footage so it is not clear whether Officer Wright initiated the chase or whether defendant had already taken off by 20:35:44.
Defendant's Exhibit 8 is a still shot from McCaw's body worn camera video marked 20:35:44. Def.'s Ex. 8, Still Image. In the upper left-hand corner of the photo, one can observe Officer Wright's leg and foot just outside the car in what appears to be a position consistent with running. Id. Exhibit 9, a still shot marked 20:35:45, depicts the officer now at the curb and running. Def.'s Ex. 9, Still Image. Based on this evidence, the defense argues that it was the officer's leaping out and running that prompted the defendant's flight. Tr. at 96:7-11.
But the photos do not establish that sequence - or any sequence - since defendant is not visible in any of Officer McCaw's body camera footage. The Court reviewed the body camera footage of the other officers on the scene and none capture the precise moment defendant began to run nor do they capture both Officer Wright's and defendant's movements in the same frame at the point the chase began. Therefore, the Court finds that the only evidence introduced by the defendant is inconclusive, and that it does not contradict the testimony in the record that the defendant bolted as Officer Wright got out of the car. And more important, whether the defendant broke into a run at the precise instant the car stopped, the door opened, and the officer placed his first foot on the ground, or he began to move purposefully towards the defendant, the legal analysis of the split-second interaction does not change.
ANALYSIS
The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and no warrant shall issue, but upon probable cause." U.S. Const. amend. IV. However, the Supreme Court has recognized an exception to the warrant requirement in that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow , 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), quoting Terry v. Ohio , 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence,"
*67 Illinois v. Wardlow , 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), an officer must "articulate something more than an 'inchoate' and unparticularized suspicion or 'hunch.' " Sokolow , 490 U.S. at 7, 109 S.Ct. 1581, quoting Terry , 392 U.S. at 27, 88 S.Ct. 1868. In a reasonable suspicion analysis, the Court must consider "the totality of the circumstances as the officer on the scene experienced them." United States v. Jones , 584 F.3d 1083, 1086 (D.C. Cir. 2009), quoting United States v. Edmonds , 240 F.3d 55, 59 (D.C. Cir. 2001).
In determining the lawfulness of a Terry stop, the Court must first determine when the defendant was seized and whether the seizure was supported by reasonable suspicion. A seizure that would implicate the Fourth Amendment and Terry takes place when a police officer physically overpowers an individual or when the individual submits to a show of authority by law enforcement. California v. Hodari D. , 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "There is no seizure without that person's actual submission." Brendlin v. California , 551 U.S. 249, 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). Moreover, "[n]ot all interactions between police and citizens are stops." Jones , 584 F.3d at 1086. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick , 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ; see also United States v. Drayton , 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.").
At the hearing, defense counsel initially took the position that defendant was seized when Officer Wright exited the car, and that the government had failed to establish the necessary reasonable basis for suspicion at that point. Tr. at 109:6-12. But in his supplemental filing, defendant concedes that he was not seized until he "dropped to the ground in response to the police call to stop." Def.'s Suppl. at 4; see Brendlin , 551 U.S. at 249, 127 S.Ct. 2400.
Thus, the question to be determined is whether the officers had a reasonable articulable suspicion that the defendant was engaged in criminal activity at that point. Applying the legal precedent this Court is required to follow, the Court finds that the combination of circumstances in this case - the defendant's presence in a high crime area, his altered movement in response to the code word "Omaha," and his flight from police as they got out of the car - were sufficient to give rise to the reasonable suspicion needed to justify a Terry stop under Wardlow , 528 U.S. at 119, 120 S.Ct. 673.
In Wardlow , the Supreme Court held that the defendant's "presence in an area of heavy narcotics trafficking" combined with "his unprovoked flight upon noticing the police" gave rise to a reasonable suspicion of criminal activity. 528 U.S. at 124, 120 S.Ct. 673. As the Court explained:
An individual's presence in a "high crime area," standing alone, is not enough to support a reasonable, particularized suspicion of criminal activity, but a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation. In this case, moreover, it was also [defendant's] unprovoked flight that aroused the officers' suspicion. Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion.... In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences from suspicious behavior, and this Court cannot *68 reasonably demand scientific certainty when none exists. Thus, the reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior.
Wardlow , 528 U.S. at 119, 120 S.Ct. 673 (internal citations omitted).
Applying that precedent here, the defendant's flight from police in a high crime area was sufficient to create the reasonable suspicion needed to justify a Terry stop. See also Hargraves v. District of Columbia , 134 F. Supp. 3d 68, 80 (D.D.C. 2015) ("The Supreme Court made clear in Illinois v. Wardlow, 528 U.S. at 125, 120 S.Ct. 673, that police officers are justified in making a Terry stop where a suspect flees from the scene without any other provocation than the presence of the police, particularly in a high crime area.").
In his motion to dismiss, defendant argues that by "turning away from police," he was merely refusing to interact with an officer, which is not itself a criminal act. Def.'s Mot. at 6. The Court cannot quarrel with that; defendant is correct that the Supreme Court has consistently affirmed an individual's "right to ignore the police and go about his business." Wardlow, 528 U.S. at 125, 120 S.Ct. 673. And in accordance with that principle, a court might well have found that defendant's mere decision to walk away from the block would not have been enough to support a Terry stop if the defendant had in fact been detained as he walked away. But the defendant was seized after something else happened: he ran away. And as the Supreme Court observed in Wardlow , "[f]light, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." 528 U.S. at 125, 120 S.Ct. 673.
Defendant argues that Wardlow does not govern this case because the Supreme Court characterized the flight in that case as "unprovoked," 528 U.S. at 124, 120 S.Ct. 673, while here, the defendant's flight was "provoked" when Officer Wright "jumped out" of his vehicle. Def.'s Suppl. at 4-5; Tr. at 95-96. The first problem with this argument is that there is no evidence in the record to support a finding that counsel is correct about when or why the defendant broke into a run. The defendant did not testify. None of the videotapes depict the precise point when the defendant took off. The one witness who did testify about the encounter resisted the "jump out" characterization. Tr. at 41:10-15. And the piece of evidence the defense proffered - a still photo taken from the body worn camera footage, simply shows that at a point in time when the officer was apparently running, the defendant was no longer visible in the frame. Def.'s Ex. 8, Still Image. Moreover the evidence in the record as a whole is equally consistent with a conclusion that the defendant began walking away when he was alerted by the signal "Omaha" to the possible presence of police on the block, but that he ran when it became crystal clear that the car belonged to the police, and they were definitely going to engage with the people on the block. The record shows that while the defendant was still merely walking, Officer Wright, who was wearing the labelled vest, addressed defendant from the open car window and identified himself as a police officer. Officer Wright then stopped the car and at that point, as Officer Wright got out, the defendant began to run.
Even if one accepts defense counsel's assertion that the defendant's flight was specifically prompted by the fact that the officer got out of the car - "with a purpose," as described by Officer McCaw, Tr. 41:14-15, or even with the sort of alacrity that might be consistent with the moniker, "jump out" squad, Tr. 53:4-8 - what we appear to have is flight prompted by police investigative activity and not otherwise *69 "provoked," and therefore, Wardlow is directly on point. In the end, the defendant introduced no evidence that the police did anything other than appear and focus their attention on him.
As the Supreme Court put it in the first sentence of its opinion, "[r]espondent Wardlow fled upon seeing police officers patrolling an area known for heavy narcotics trafficking." 528 U.S. at 121, 120 S.Ct. 673. As the "caravan" of four vehicles was "converging" on the high crime area, id. , Wardlow "looked in the direction of the officers and fled." Id. at 122, 120 S.Ct. 673. The Court explained:
In this case ... it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight - wherever it occurs - is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.
Id. at 124, 120 S.Ct. 673 (internal citations omitted). The Court distinguished Wardlow's behavior from that of someone simply ignoring the officers or refusing to cooperate "without more:"
[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.
Id. at 125, 120 S.Ct. 673. So while the Supreme Court used the word "unprovoked" in its opinion, the defense is placing too much weight on the adjective here. The Supreme Court's reasoning, and its description of the sort of flight that could support an investigative stop, is equally applicable to the instant situation. Like Wardlow, defendant Bridges did not simply "go about his business," and he did not merely "refuse to cooperate without more ." Id. at 121, 120 S.Ct. 673 (emphasis added). The officers, who even according to the defense, had done nothing other than disembark from their car, were confronted with "headlong flight" - "the consummate act of evasion" - and therefore, under Wardlow , the officers did not intrude on the Constitution when they directed the defendant to stop. Id. at 124, 120 S.Ct. 673. One could engage in a principled policy debate about the utilization and tactics of the Gun Recovery Unit, but the record here simply does not supply any factual basis to differentiate this case from the controlling authority. There may be a case in the future that squarely presents the question of whether flight by a person who was put in fear by an aggressive or intimidating "jump out" can supply the reasonable basis for suspicion, but those facts were not introduced here.
This opinion does not in any way dispute the observation in Wardlow that "flight is not necessarily indicative of ongoing criminal activity." 528 U.S. at 125, 120 S.Ct. 673.[3] But the Supreme Court emphasized that Terry stops may often be prompted by conduct that is ambiguous, or equally *70 consistent with an innocent explanation. Id.
In allowing such detentions, Terry accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way. But in this case the officers found respondent in possession of a handgun ....
Id. at 126, 120 S.Ct. 673. Thus, the fact that in many circumstances there may be innocent reasons to run is not a basis to find that the Fourth Amendment was violated in this case.
Defendant points to Miles v. United States , 181 A.3d 633, 635 (D.C. 2018), in which the D.C. Court of Appeals found that flight provoked by the police was not sufficient to give rise to a reasonable suspicion. Def.'s Suppl. at 6-7. But Miles is factually distinguishable from the present case because there, an officer "literally ... drove right onto the sidewalk" towards the defendant. 181 A.3d at 643-44. The Court viewed the officer's conduct as "startling and possibly frightening to many reasonable people," and therefore concluded that in that particular situation, the defendant's flight could not have reasonably been viewed as indicative of a consciousness of guilt. Id. at 644. Here, Officer Wright spoke calmly to the defendant from his car window. He did then stop the car and get out, but he did not aim his car at the defendant or draw his weapon, and there was no testimony elicited from anyone who was there that could support a finding that he engaged in any other aggressive or intimidating behavior. So, the facts are more comparable to those in Wardlow than in Miles .
Defendant also cites Posey v. United States , 201 A.3d 1198 (D.C. 2019), in which the D.C. Court of Appeals again found that officers lacked reasonable suspicion notwithstanding the defendant's flight from police. Def.'s Suppl. at 6. But in that case, the Court was confronted with a stop based on an extremely vague description - a black man in a black jacket - and the Court held that the additional fact of his flight was not enough to alter the calculus. Posey , 201 A.3d at 1204. The nature of the neighborhood - which the Supreme Court found to be significant in Wardlow - was not addressed, and neither Posey nor Miles are binding on this Court in any event. But even the Posey court acknowledged that "flight is viewed in the context of the specific facts and corroborating circumstances of each individual case." 201 A.3d at 1204.
Here, the combination of all of the circumstances - the undisputed nature of the neighborhood, the officers' understanding that they had been sent there due to recent gun violence, the steps the defendant took to walk away from the direction the officers were headed when he was alerted to their presence, and the defendant's sudden flight after the officers directly engaged with him as they got out of the car - was sufficient under Terry and Wardlow to create an objective, reasonable justification for stopping him. Therefore, the motion to suppress the firearm, that was visible and recovered after the defendant was seized, will be denied.

At the Court's request, the government supplied the Court with all of the body worn camera videos from all the officers who participated in the arrest. Notice of Filing Correspondence [Dkt. # 23].

The body camera footage contains a time stamp on the top right corner which Officer McCaw referred to as "Zulu Time." Tr. 11:5-12. This time stamp reflects the real time that the video was recorded. Id. That time is recorded in Greenwich Mean Time ("GMT") rather than Eastern Standard Time. Id. Therefore, the 20:35:54 time stamp that appears in this frame indicates that the incident took place at 12:35 am GMT or 4:35 pm Eastern Standard Time.

In his supplemental brief, defendant cites United States v. Stubblefield , 820 F.3d 445 (D.C. Cir. 2016) for the proposition that flight alone cannot give rise to probable cause. Def.'s Suppl. at 5. But that is not the question posed in this case; the only issue is whether the circumstances taken as a whole met the lower reasonable suspicion standard needed for a Terry stop.