*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0143

D.W., Appellant,

v.

United States, Appellee.

Appeal from the Superior Court
of the District of Columbia
(2017-CF2-014804)

(Hon. Robert A. Salerno, Trial Judge)

(Argued January 20, 2022; reargued January 14, 2025     Decided July 17, 2025)

*Victoria J. Hall-Palerm* and *KC Bridges*, Public Defender Service, with whom *Samia Fam*, *Jaclyn S. Frankfurt*, *Mikel-Meredith Weidman*, and *Dennis Martin*, Public Defender Service, were on the briefs, for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time the brief was filed, *Matthew M. Graves*, United States Attorney at the time the supplemental brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Suzanne Grealy Curt*, *John P. Mannarino*, and *Amy Joy Thomas*, Assistant United States Attorneys, were on the briefs, for appellee.

Before McLeese and Shanker, *Associate Judges*, and Glickman, *Senior Judge*.[*]

---

[*] Senior Judge Ferren was originally assigned to this case. Following his retirement on April 21, 2023, Associate Judge Shanker was assigned to take his

Opinion for the court by *Associate Judge* MCLEESE.

Concurring opinion by *Associate Judge* MCLEESE at page 17.

Opinion by *Senior Judge* GLICKMAN, concurring *dubitante*, at page 24.

MCLEESE, *Associate Judge*: Appellant D.W. appeals his convictions for several firearm offenses, arguing that the trial court erroneously denied his motion to suppress evidence. We agree with D.W., and we therefore vacate the judgment and remand for further proceedings.

## I. Factual and Procedural Background

The evidence at the suppression hearing included the following. On the day at issue, officers of the Metropolitan Police Department Crime Suppression Team (CST) went to the Geraldine Apartment Complex as part of their "normal, everyday operations." The officers were not responding to a specific report of criminal activity. The Geraldine is a "pretty high-crime area . . . known for drug trafficking, drug sales and gun violence." Specifically, one of the members of the CST, Officer John Bewley, who worked on the CST for three years, had personally responded to reports at the Geraldine of "[h]omicides, assault with dangerous weapon, guns, [and] knives." Officer Bewley had not reviewed any crime statistics for the Geraldine

_____

place on the division. Judge Glickman was an Associate Judge at the time of the first argument. His status changed to Senior Judge on December 21, 2022.

before the date at issue. He did not know how many violent crimes had occurred at the Geraldine in the previous year or two years. Officer Bewley indicated that he would use the term "high-crime area" to describe a complex in which there were five to ten crimes in a year. Officer Bewley testified that it was fairly common knowledge in the Metropolitan Police Department that the Geraldine is a high-crime area.

Another member of the CST who was involved in D.W.'s arrest, Officer Krishaon Ewing, also described the Geraldine as a high-crime area. He had personally recovered narcotics and numerous firearms in the area, and he had also been to the area in response to multiple shootings and stabbings. Officer Ewing indicated that he would call an area a high-crime area if the police consistently recovered drugs and firearms in the area. Officer Ewing testified that the Geraldine had a reputation among officers in his district as a high-crime area.

The CST officers were in uniform and were driving in unmarked cars. There were several officers in three cars. One of the cars was "down the street" from the car Officer Bewley was in, and Officer Bewley was not sure where the third car was. The car that Officer Bewley was in stopped, and Officer Bewley and another officer got out at the same time. Officer Bewley started walking toward a breezeway that led to a parking lot. He saw D.W., who was standing near the breezeway with

several other people. Within a few seconds, D.W. saw Officer Bewley and then ran at a "full sprint." Officer Bewley did not say anything to D.W. before D.W. ran. There was no testimony about the exact distance between Officer Bewley and D.W. when D.W. started running, but Officer Bewley testified that he was "pretty far away" from the breezeway and body-worn camera footage that was admitted into evidence appears to indicate that Officer Bewley and D.W. were over fifty feet apart.

Officer Bewley chased D.W. Officer Bewley testified that D.W. was grabbing at and holding his waistband area while running, but no such motions are visible on the body-worn camera footage. D.W. ran into the parking lot, out of the parking lot, and through an alley before cutting between two houses and jumping a chain-link fence. Other officers, including Officer Ewing, also got involved in the chase. After running behind another building, D.W. attempted to jump another chain-link fence that was six to ten feet high. D.W.'s leg got caught on the fence, however, and officers apprehended him.

As officers apprehended D.W., D.W. pulled a gun from his pant leg and dropped the gun to the ground.

One other individual on the scene ran from the police as well, and he was stopped and searched but was not arrested. The search of that person included an officer placing his hand on the individual's "crotch area" looking for a gun. Officer

Bewley had previously performed searches of this kind at the Geraldine when searching for guns and drugs. It also was typical that when someone was stopped and searched, that person would be kept sitting handcuffed in public for a period of time that could be as long as an hour.

Another individual responded to one of the officers walking toward the individual by raising his arms up "in . . . a T." It was "typical for some men" to do that when police approached them at the Geraldine. Yet another individual lifted his shirt to show that he did not have a gun when Officer Bewley ran by. It was typical for individuals at the Geraldine to respond in that way.

A defense investigator testified that she had looked in a public database called D.C. Crime Maps and located information about only one homicide within 1,000 feet of the Geraldine, which was a stabbing that occurred in 2015. The investigator did not know who maintained the database and knew nothing about its accuracy. The investigator did not check the database for crimes involving firearms or drugs.

The trial court denied D.W.'s motion to suppress evidence. The trial court credited the testimony of Officers Bewley and Ewing that the Geraldine was a high-crime area. The trial court concluded that statistics were not necessary on that point, instead relying on the officers' testimony about their own experiences at the Geraldine and the general reputation of the Geraldine within the Metropolitan Police

Department. The trial court declined to give weight to the testimony of the defense investigator because that testimony was limited to homicides and it was unclear what information was recorded on the database the investigator reviewed.

The trial court declined to credit Officer Bewley's testimony that D.W. was reaching for his waistband during the chase.

The trial court found that D.W.'s flight was immediate and headlong, occurred upon the mere sight of the police, was sustained, and involved jumping fences "in [] apparent desperation." The trial court further found that "the police did nothing to provoke the flight; they simply appeared at the complex." Given those circumstances, it was reasonable to infer that D.W.'s flight reflected consciousness of guilt.

The trial court acknowledged that one person other than D.W. fled, was caught and searched, and was released after no weapon was found. A second person lifted his arms to prepare for a frisk, and another person lifted his shirt as if to indicate that he was not armed. Most people, however, simply went about their business.

On the basis of these findings, the trial court denied the motion to suppress, concluding that D.W.'s unprovoked flight in a high-crime area gave the police reasonable, articulable suspicion to stop D.W.

D.W. was subsequently found guilty at a stipulated trial.

After this appeal was briefed and argued, the court granted rehearing en banc in *Mayo v. United States*, 284 A.3d 403 (D.C. 2022). This appeal was held in abeyance until the en banc decision in *Mayo* was issued. *Mayo v. United States*, 315 A.3d 606 (D.C. 2024) (en banc). The division in this case then directed the parties to file supplemental briefs and held reargument.

## II. Analysis

We review the trial court's legal rulings de novo, and we defer to the trial court's findings of fact unless they are clearly erroneous. *Mayo*, 315 A.3d at 616. We are not limited to the trial court's express findings. *Id.* at 616-17. We view the evidence in the light most favorable to the trial court's ruling, and we also may rely on facts that were undisputed at the suppression hearing. *Id.* at 617.

The primary issue in this case is whether the police acted lawfully when they initially seized D.W. It is undisputed that the initial seizure of D.W. was an investigative detention (also called a *Terry* stop) and therefore was lawful if the police had "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted).

The general framework for determining whether the police had reasonable, articulable suspicion is well settled. Reasonable, articulable suspicion (1) is "not reducible to precise definition or quantification," *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation marks omitted); (2) is a "commonsense, nontechnical conception[]," *Ornelas v. United States*, 517 U.S. 690, 695 (1996); (3) turns on the "totality of circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); (4) requires considerably less than proof by a preponderance of the evidence and obviously less than probable cause, *Kansas v. Glover*, 589 U.S. 376, 380 (2020), although probable cause is also "incapable of precise definition or quantification into percentages," *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (internal quotation marks omitted); (5) requires "more than an inchoate and unparticularized suspicion or hunch of criminal activity," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (internal quotation marks omitted); *see also Alabama v. White*, 496 U.S. 325, 329-30 (1990) ("The Fourth Amendment requires some minimal level of objective justification for making the stop.") (internal quotation marks omitted); and (6) can be based on police observations of actions that might have an innocent explanation, as long as those actions, considered as a whole, are sufficiently suspicious, *see Wardlow*, 528 U.S. at 125 ("[I]n *Terry* [*v. Ohio*, 392 U.S. 1 (1968)], the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.").

The trial court identified two factors that supported a determination of reasonable, articulable suspicion: D.W.'s presence in a high-crime area and D.W.'s unprovoked flight. After the trial court's ruling in this case, this court issued its en banc decision in *Mayo*, 315 A.3d 606, which also addressed whether a suspect's flight and presence in a so-called "high-crime area" sufficed to support a determination of reasonable, articulable suspicion. *See id.* at 622-23. Because the decision in *Mayo* is of central importance in resolving the present case, we discuss that decision in some detail.

**A. *Mayo***

We focus on *Mayo*'s discussion of (1) "high-crime area" evidence, which *Mayo* renamed "general locational crime evidence," 315 A.3d at 632; (2) flight; and (3) the totality of the circumstances.

**1. General locational crime evidence**

The court in *Mayo* stated several legal principles concerning general locational crime evidence. First, the court acknowledged that such evidence can be relevant in determining whether reasonable, articulable suspicion exists. *Mayo*, 315 A.3d at 632-33. Second, the court reiterated prior warnings "against reliance on the 'high crime area' phrase as a talismanic litany to justify *Terry* stops." *Id.* at 633

(internal quotation marks omitted). Third, the court held that "courts should no longer give weight to a bare 'high-crime area' label in assessing the validity of a *Terry* stop." *Id.* at 634. Fourth, the court held that "conclusory assertions will not suffice; an officer instead must be able to point to specific evidence that led the officer to suspect criminal activity in a particular circumstance." *Id.* (ellipsis and internal quotation marks omitted). Fifth, the court held that "assessing the value of general locational crime information in interpreting potentially suspicious conduct will be a fact-intensive inquiry . . . [that] should turn on the quality and specificity of the information, with particular focus on the recency, frequency, and geographic proximity of the relevant criminal activity." *Id.* at 635.

The court in *Mayo* applied those principles to the general locational crime evidence before it. 315 A.3d at 612-13, 636. That evidence came from an officer who testified that (1) the Gun Recovery Unit (GRU) was often sent to patrol the neighborhood in which the stop had occurred; (2) the GRU had recovered multiple weapons, handguns, and narcotics in the neighborhood; and (3) in the preceding three years, the GRU had recovered over ten guns from the neighborhood, which was "one of the higher amounts . . . compared to other parts of the city." *Id.* at 612-13 (ellipsis omitted).

The court held that this evidence "add[ed] little" and was not "sufficiently specific or well-grounded to place Mr. Mayo's innocuous conduct in a different light or make his flight more indicative of consciousness of guilt." *Mayo*, 315 A.3d at 636. Specifically, the court held that the testimony about narcotics "had no demonstrated connection to a suspicion that Mr. Mayo was armed"; the officer's testimony about guns "lacked meaningful specificity" because the officer had not identified the boundaries of the neighborhood at issue; and the testimony about having recovered over ten guns in a three-year period was "weak tea at best." *Id.* The court thus concluded that the evidence of prior criminal activity in the neighborhood at issue did not "provide[] objectively useful context" in determining whether the police had reasonable, articulable suspicion. *Id.* at 635.

## 2. Flight

The court in *Mayo* also stated a series of legal principles relating to evidence of a suspect's flight: (1) "[a] defendant's flight from the police can be a relevant factor in the reasonable suspicion analysis," 315 A.3d at 624-25 (brackets and internal quotation marks omitted); (2) "headlong flight is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such," *id.* at 625 (brackets, ellipsis, and internal quotation marks omitted); (3) flight must be viewed in context, *id.*; (4) "[t]here are myriad reasons an innocent

person might run away from the police," including "natural fear or dislike of authority, a distaste for police officers based upon past experience, a fear of police brutality or harassment, a fear of being apprehended as the guilty party, or other legitimate personal reasons," *id.* (brackets, ellipsis, and internal quotation marks omitted); (5) "any evaluation of a reasonable police officer's interpretation of [a suspect's] flight must take into account that some individuals in highly policed communities might fear over-aggressive police conduct and may flee as a result even if they are innocent of any wrongdoing," *id.* at 630; (6) "both . . . Black and Brown men in particular have reason to be apprehensive of police, and . . . this apprehension may be considered in assessing whether the actions the police observe provide reasonable articulable suspicion," *id.* at 631 n.16; and (7) "when the aggressive nature of a police presence in a community makes flight simply to avoid police interactions a plausible response, such flight cannot automatically be understood as a manifestation of consciousness of guilt and its value in a reasonable articulable suspicion analysis is significantly reduced," *id.* at 632.

The court in *Mayo* applied those principles to the circumstances of the flight in *Mayo*. 315 A.3d at 627-32. Those circumstances were that (1) before Mr. Mayo fled, three GRU officers singled Mr. Mayo out and followed him, saying they wanted to talk to him and asking him if he had guns, *id.* at 628; (2) the GRU officers should have understood that those actions communicated to Mr. Mayo "that they did not

intend to allow him to leave without engaging with them," *id.*; (3) the GRU officers lacked a lawful basis to stop Mr. Mayo at that point, *id.*; (4) the GRU officers' conduct and accusatory questioning could have "prompt[ed] a reasonable, innocent person who fears unjustified arrest to flee," *id.* at 629; (5) the GRU officers reasonably should have been aware that the stop was taking place in a "highly policed communit[y]" in which individuals might "fear aggressive tactics," *id.* at 631; (6) the GRU officers should reasonably have been aware that the GRU had a reputation for being "aggressive in [the] hunt," *id.* (internal quotation marks omitted); and (7) the GRU officers "could not reasonably perceive Mr. Mayo's flight as clearly reflecting consciousness of guilt; rather it is more consistent with the apprehensiveness that would naturally be felt by a person in his situation," *id.* at 632 (internal quotation marks omitted).

### 3. Totality of the circumstances

The court in *Mayo* concluded that the stop there was not supported by reasonable, articulable suspicion. 315 A.3d at 636-38. With respect to Mr. Mayo's flight, the court explained that the GRU officers should have understood that individuals might fear their aggressive tactics. *Id.* at 637. With respect to the general locational crime evidence, the court held that it "lacked meaningful specificity" and did not establish that the rate of crime in the area was "high." *Id.* In sum, the court

concluded that "[a]t most, the facts establish that GRU officers had an inchoate and unparticularized hunch that Mr. Mayo was carrying a weapon." *Id.*

The court in *Mayo* also distinguished the facts in *Mayo* from the facts of the Supreme Court's decision in *Wardlow*. First, the court described the facts of *Wardlow* as being that the police were "converging on an area known for heavy narcotics trafficking" and saw Mr. Wardlow "at a particular location where active drug activity was anticipated." *Mayo*, 315 A.3d at 626, 633 (internal quotation marks omitted). Second, the court concluded that the Supreme Court's holding in *Wardlow* that the stop at issue was lawful rested not only on Mr. Wardlow's flight and the fact that Mr. Wardlow was in a "high-crime area" but also on the fact that Mr. Wardlow was holding an opaque bag. *Id.* at 626 n.12. Third, and more generally, the court stated that *Wardlow* did not hold that flight invariably justifies a *Terry* stop or that "*Terry* stops could be substantiated based on the mere affixing of a dangling comparative label of 'high crime' to certain city blocks or even entire neighborhoods." *Id.* at 627, 633. Finally, the court stated that the record in *Wardlow* "did not contain . . . credited evidence" about aggressive police conduct. *Id.* at 631 n.17.

Based on its interpretation of *Wardlow*, the court in *Mayo* stated that *Mayo* was "nothing like *Wardlow*." *Mayo*, 315 A.3d at 627.

**B. The Present Case**

Whether the stop in this case was lawful depends on the weight that can properly be given to the general locational crime evidence and to D.W.'s flight. The general locational crime evidence in this case is stronger in one respect than such evidence in *Mayo* because the evidence in this case is more geographically specific and compact, relating to a single complex rather than an imprecisely defined neighborhood. On the other hand, the general locational crime evidence in this case otherwise reflects the shortcomings identified in *Mayo*. Some of the evidence was simply general testimony about the Geraldine's reputation; some of the evidence was about crime in general and thus lacked a "demonstrated connection to a suspicion that" D.W. was committing an offense, *Mayo*, 315 A.3d at 636; and neither of the officers was able to be concrete about numbers of offenses that had taken place at the Geraldine in any specific time frame. In our view, fair application of the approach taken by the court in *Mayo* supports a conclusion that the general locational crime evidence in this case was "weak tea at best" and did not "provide[] objectively useful context" in determining whether the police had reasonable, articulable suspicion. *Id.* at 635-36.

That leaves D.W.'s flight. That flight was in one important respect more suspicious than Mr. Mayo's flight, because D.W. fled before officers had singled

him out in any way. On the other hand, there was evidence in this case relating to the concerns expressed in *Mayo* about flight as an innocent response to reasonable fear of aggressive police conduct. We need not delve further into these complexities, however, given our holding in *Posey v. United States*, 201 A.3d 1198 (D.C. 2019), that "a nondescript individual distinguishing himself from an equally nondescript crowd by running away from officers unprovoked does not, without more, provide a reasonable basis for suspecting that individual of being involved in criminal activity and subjecting him or her to an intrusive stop and police search." *Id.* at 1204.

We conclude that our decisions in *Mayo* and *Posey*, taken together, require reversal of the trial court's order denying the motion to suppress evidence in this case. *Mayo* leads to the conclusion that the general locational crime evidence in this case added little if anything to reasonable, articulable suspicion. *Posey* holds that even unprovoked headlong flight is not by itself sufficient to justify a stop. We acknowledge the trial court's point that D.W.'s flight could be viewed as more suspicious because of the desperation reflected in his jumping fences. We view that point as having at least some relevance, but we do not view the point as warranting a result different from our holdings in *Mayo* and *Posey*. An innocent individual who feared "police brutality or harassment" or "over-aggressive police conduct" might well reflect that fear by taking measures such as jumping fences. *Mayo*, 315 A.3d at 625, 630 (internal quotation marks omitted).

The United States argues that affirmance in this case is required by the Supreme Court's decision in *Wardlow*. We disagree. As the court in *Mayo* interpreted *Wardlow*, *Wardlow*'s holding rested in part on two factors not present in this case: Mr. Wardlow's holding of an opaque bag that could have contained illegal drugs and information that drug activity was anticipated in the "particular location" where Mr. Wardlow was observed. *Mayo*, 315 A.3d at 626 & n.12, 633.

Finally, for the first time on appeal, the United States contends that suppression of evidence was not justified under the exclusionary rule even if the stop was unlawful. We decline to consider that argument. *See, e.g.*, *In re R.W.*, 334 A.3d 593, 605-06 (D.C. 2025) (declining to consider exclusionary-rule argument raised for first time on appeal; citing cases).

For the foregoing reasons, we vacate the judgment of the Superior Court and remand the case for further proceedings.

*So ordered.*

MCLEESE, *Associate Judge*, concurring: I join the opinion of the court in its entirety. I write separately to address a complication arising from the fact that the court's opinion in this case relies heavily on *Mayo v. United States*, a case in which I dissented. 315 A.3d 606, 639-58 (D.C. 2024) (en banc) (McLeese, J., dissenting).

That ordinarily would not present an issue, because I fully acknowledge my obligation in subsequent cases to follow the holdings of decisions of the court in cases in which I dissented. The complication arises more narrowly as to one of the areas of my disagreement with the decision of the court in *Mayo*: my view that the opinion of the court in *Mayo* incorrectly interpreted the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119 (2000). *Mayo*, 315 A.3d at 649, 652-53, 655-56. Specifically, I concluded in my dissent in *Mayo* that (1) the *Mayo* court's view that the possibility that innocent persons might flee out of fear substantially reduced the weight to be given to flight was inconsistent with the reasoning of *Wardlow*, *id.* at 650; (2) the opinion of the court in *Mayo* inaccurately described the facts of *Wardlow*, *id.* at 653; (3) the approach to general locational crime evidence taken by the opinion of the court in *Mayo* was inconsistent with the weight given to such evidence in *Wardlow*, *id.* at 652-53; and (4) the opinion for the court in *Mayo* incorrectly interpreted the holding in *Wardlow* to rest in part on Mr. Wardlow's possession of an opaque bag, *id.* at 655-56.

My view that the opinion of the court in *Mayo* incorrectly interpreted the Supreme Court's decision in *Wardlow* raises a challenging question for me. In general terms, the question is: How should a lower-court judge proceed if (1) the judge personally interprets a decision of the Supreme Court of the United States in one way; but (2) a lower-court decision normally binding on the judge, either by the

judge's own court or by a higher court other than the Supreme Court of the United States, has adopted a different and inconsistent interpretation of the Supreme Court's opinion? Should the judge follow his or her own personal view as to the proper interpretation of the Supreme Court opinion or the differing view adopted by the normally binding decision of the lower court?

As far as I have been able to determine, neither the Supreme Court of the United States nor this court has expressly answered this question. I have located several decisions in which federal circuit courts of appeals have squarely addressed the question, and all of those decisions hold that judges on a subsequent panel are bound by prior circuit decisions interpreting Supreme Court cases, even if those judges believe that the prior circuit decisions misinterpreted the Supreme Court cases at issue. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1301-04 (11th Cir. 2001) (even if prior decision of circuit misinterpreted Supreme Court case that prior decision discussed, subsequent panel of circuit was bound by prior circuit decision); *Barber v. Johnson*, 145 F.3d 234, 237 (5th Cir. 1998) (same); *Clow v. U.S. Dep't of Hous. & Urb. Dev.*, 948 F.2d 614, 616 n.2 (9th Cir. 1991) (per curiam) ("The dissent does not argue that an intervening Supreme Court decision has cast doubt on our prior circuit law, rather it asserts that the very Supreme Court decision upon which these cases rely does not support their holdings. If we were all free to disregard our prior circuit law based on our own predilections as to whether these decisions

properly construe the Supreme Court cases upon which they rely, the doctrine of stare decisis would have little meaning in our circuit. Accordingly, contrary to the dissent's suggestion, we have no authority to revisit our circuit's embrace of the doctrine of hypothetical jurisdiction."), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). The sole state case I have found addressing an analogous situation reached the equivalent conclusion. *State v. Cousins*, 473 P.3d 961 (table), No. 121,676, 2020 WL 6243299, at *9 (Kan. Ct. App. Oct. 23, 2020) ("Cousins argues that *Perkins* was wrongly decided because it misinterpreted United States Supreme Court caselaw. But this court is bound by Kansas Supreme Court precedent unless there is some indication that the court is departing from its earlier position, and here there is not.").

As an aside, I note that there appear to be conflicts in the circuits about how to handle two related but distinct situations: (1) where a prior circuit decision has overlooked Supreme Court authority, *compare, e.g.*, *Sabal Trail Transmission, LLC v. 18.27 Acres of Land*, 59 F.4th 1158, 1160, 1173 (11th Cir. 2023) (under "prior-precedent rule" prior decisions of circuit are binding even if prior circuit decisions overlooked contrary Supreme Court decisions), *with, e.g.*, *United States v. Tann*, 577 F.3d 533, 542 (3d Cir. 2009) (subsequent circuit panel not bound by prior decision of circuit that did not address contrary Supreme Court authority), and (2) where a circuit-court panel "believes that there is conflict between an initial

binding precedent [of the circuit] and a subsequent decision [of the circuit] that interpreted the initial precedent," *Parker v. K & L Gates, LLP*, 76 A.3d 859, 880 n.2 (D.C. 2013) (McLeese, J., concurring) (citing cases).

Turning back to the precise issue before me, I do not view that issue as an easy one. On one hand, the obligation of lower courts to follow the holdings of the Supreme Court has been described as "absolute, as it must be in a hierarchical system." *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 117 F.4th 389, 395 (6th Cir. 2024) (quoting *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part)). It seems counterintuitive that a decision of a lower court that incorrectly interprets a Supreme Court decision should be treated as requiring later judges of that lower court to follow incorrect decisions of that lower court rather than the actual holding of the Supreme Court.

On the other hand, the view that a lower-court decision interpreting a Supreme Court case is not binding on judges of that lower court would have surprising and undesirable consequences. As the Ninth Circuit put it, "If we were all free to disregard our prior circuit law based on our own predilections as to whether these decisions properly construe the Supreme Court cases upon which they rely, the doctrine of stare decisis would have little meaning . . . ." *Clow*, 948 F.2d at 616 n.2. To further illustrate the potential implications of such an approach, it would seem to

follow that federal district court judges could decline to follow decisions of their circuit interpreting Supreme Court cases, instead taking the view that their obligation was to follow their own understanding of what the Supreme Court had held.

On balance, I generally lean toward the view taken by the circuit courts that have addressed the issue. Thus, I conclude that, at least barring unusual circumstances, I am bound by the holdings of decisions of this court interpreting a Supreme Court case, even if in my view those decisions incorrectly interpreted the Supreme Court case at issue.

I view it as a close question whether there are unusual circumstances that might warrant following my own understanding of *Wardlow* rather than the interpretation of *Wardlow* reflected in *Mayo*. I expressed the view in my dissenting opinion that *Wardlow* "unambiguously foreclose[d] the approach to general locational crime evidence taken by the opinion for the en banc court in this case." *Mayo*, 315 A.3d at 653 (McLeese, J., dissenting). I also explained that in my view the interpretation of *Wardlow* adopted by the court in *Mayo* led the court's opinion in *Mayo* to "depart[] from the path of 'commonsense, nontechnical' reasoning that the Supreme Court has directed us to follow." *Id.* at 654 (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)). Finally, I noted that the court's interpretation of *Wardlow* in *Mayo* led the court in *Mayo* to invalidate the search in that case even

though other courts around the country had consistently upheld searches in comparable circumstances. *Id.* at 656-67 (citing cases).

My views about the decision of the court in *Mayo* have not changed. Moreover, because the decision in *Mayo* was of the en banc court, one of the safeguards against erroneous lower-court interpretations of Supreme Court opinions—review by a court sitting en banc—is not practically available. Nevertheless, I conclude that the circumstances in this case are not sufficiently unusual to warrant a departure from what I take to be the general rule that I should adhere to the decisions of this court interpreting decisions of the Supreme Court. I say that for three principal reasons: (1) I agreed with many of the points made by the opinion for the court in *Mayo*, and some of the points on which I disagreed with the decision in *Mayo* were ones as to which reasonable jurists in my view could disagree; (2) I viewed the ultimate question whether the search in *Mayo* was lawful as "close," *Mayo*, 315 A.3d at 639 (McLeese, J., dissenting); and (3) I was the sole dissenter in *Mayo*, which means that all six of my colleagues who sat on the case viewed *Wardlow* differently than I do.

For the foregoing reasons, I adhere in this case to the interpretation of *Wardlow* adopted by the court in *Mayo*. If, as I believe, that interpretation was incorrect and has set this court on a path that is contrary to the directions we have

been given by the Supreme Court, then the Supreme Court in an appropriate case could remedy that problem.

GLICKMAN, *Senior Judge*, concurring *dubitante*: I, too, join the opinion of the court; I feel obliged to do so because, like my colleagues, I believe this appeal is governed by the decisions in *Mayo v. United States*, 315 A.3d 606 (D.C. 2024) (en banc), and *Posey v. United States*, 201 A.3d 1198 (D.C. 2019). Nonetheless, I write separately because I find the outcome to be legally and logically dubious. But for our controlling precedents, I would affirm appellant's conviction on the ground that his unprovoked, headlong flight in response to seeing police officers come to his neighborhood justified an objectively reasonable and articulable suspicion that he fled because he was engaged in criminal activity.

By saying that appellant's flight was unprovoked, I mean that he fled at the mere sight of the police officers, even though they were some fifty feet away and had not singled him out or threatened him in any way. Nor can it be said that appellant was alone or in an isolated spot or otherwise in an especially vulnerable or dangerous situation when he noticed the police. Rather, he was standing outside a residential apartment complex in broad daylight, among numerous potential witnesses to how the officers would conduct themselves if they approached him.

Under those circumstances, the reason appellant's alarmed reaction to the arrival of police in his vicinity justified their stopping him for investigation is that "deliberately furtive actions and flight at the approach of . . . law officers are strong indicia of *mens rea*."[1] As the Supreme Court has explained, "[h]eadlong flight—*wherever it occurs*—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is *certainly suggestive* of such."[2] The Court has deemed these propositions to be "based on commonsense judgments and inferences about human behavior."[3] I highlight the words "wherever it occurs"—they signify, I submit, that unprovoked, headlong flight at the mere sight of police ordinarily justifies a reasonable suspicion of criminal wrongdoing whether or not such flight takes place in a so-called (though ill-defined) "high-crime area."[4]

---

[1] *District of Columbia v. Wesby*, 583 U.S. 48, 59 (2018) (quoting *Sibron v. New York*, 392 U.S. 40, 66 (1968)).

[2] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). As the Court further explained, "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Id.* at 125.

[3] *Id.*

[4] Thus, I think it unnecessary to resolve the disputed issue in this case of whether the prosecution established that the Geraldine Apartment Complex was a "high-crime area." In general, though, like the dissenters in *Wardlow*, I doubt that a neighborhood's relatively high crime rate has much bearing on whether a particular individual's flight at the sight of police is meaningfully suggestive of criminal

In *Mayo*, this court discounted the suspiciousness of unprovoked, headlong flight from police because there may be "myriad," "plausible" reasons why an innocent person might run; including, for example, a legitimate fear of police harassment or wrongful arrest.[5] But in *Wardlow* the Supreme Court rejected the "argu[ment] that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity."[6] While "[t]his fact is undoubtedly true," the Court said, the Fourth Amendment permits limited investigative stops based on reasonable suspicion even if the observed conduct was "by itself lawful," "ambiguous," and "susceptible of an innocent explanation."[7] The very purpose of such a stop is "to resolve the ambiguity."[8]

For the foregoing reasons, I concur in the court's opinion *dubitante*, i.e., with doubt as to its correctness. If the precedential slate were clean, I would dissent.

---

wrongdoing, at least in the absence of any evidence of ongoing or very recent criminal activity at or near the scene. *See generally* 4 Wayne R. LaFave, *Search and Seizure* § 9.5(g) at 744-45, 768-69 (6th ed. 2020).

[5] *Mayo*, 315 A.3d at 630,632.

[6] *Wardlow*, 528 U.S. at 125.

[7] *Id.* at 125.

[8] *Id.* I do not rule out the (hypothetical) possibility that, in a particular case, a defendant might show a site-specific pattern of aggressive law enforcement activity so pervasive and abusive that it would invalidate the otherwise reasonable inference of criminal activity from the defendant's flight at the mere sight of police. But no such showing was made in this case.